**In re MORSE TOOL, INC., Debtor.**

**David J. FERRARI, Trustee of Morse Tool, Inc., Plaintiff,**

v.

**BARCLAYS BUSINESS CREDIT, INC., f/k/a Barclays American/Business Credit, Inc., Defendant.**

**Bankruptcy No. 87–10588–CJK.**
**Adv. No. A87–1303.**

United States Bankruptcy Court, D. Massachusetts.

Dec. 14, 1992.

Gene Landy, Sp. Counsel, Mark Berman, Boston, MA, for trustee.

Charles Bennett, Boston, MA, for Barclays Business Credit, Inc.

## MEMORANDUM OF DECISION

CAROL J. KENNER, Bankruptcy Judge.

### INTRODUCTION

On August 24, 1984, Gulf and Western Manufacturing Company ("G & W") [1] sold the assets and liabilities of its unincorporated Morse Cutting Tool and Super Tool divisions ("the Divisions"), both of which manufactured industrial cutting tools, to a new entity, Morse Tool, Inc. ("Morse" or "the Debtor"), which had neither assets nor liabilities. In exchange, Morse gave G & W cash in the amount of $3,821,000 and promissory notes for an additional $6,889,000, and it pledged its real estate and equipment to G & W to secure the notes. Morse financed the cash portion of the purchase price entirely with a loan from the defendant, Barclays American/Business Credit, Inc., known now as Barclays Business Credit, Inc. ("Barclays"); in conjunction with the loan, Morse gave Barclays a promissory note and a first position security interest in its inventory and accounts receivable. Within three years, Morse filed a petition under Chapter 11 of the Bankruptcy Code, succumbed to overwhelming debt, and, while in Chapter 11, sold its manufacturing operations. The case was later con-

---

1. At the time of the 1984 transaction at issue in this proceeding, Gulf & Western Manufacturing Company was a wholly owned subsidiary of Gulf & Western, Inc. Gulf & Western divested itself of Gulf and Western Manufacturing Company in September, 1985, and later became known as Paramount Communications, Inc. Throughout this memorandum, the Court will refer to Gulf & Western Manufacturing Company simply as G & W.

verted to a liquidation proceeding under Chapter 7.

The case is before the Court now on the objection of the Chapter 7 Trustee, David Ferrari ("the Trustee"), to Barclays' secured claim. On the basis of the note and security interests it received in the above transactions, Barclays asserts a secured claim against the Morse bankruptcy estate of $3,655,855.25. In objection to Barclays' claim, the Trustee argues that Morse's obligation to Barclays and Morse's conveyance of security interests to Barclays were fraudulent under sections 4, 5, and 7 of the Uniform Fraudulent Conveyance Act ("UFCA") as adopted in Massachusetts, G.L. c. 109A, §§ 4, 5, and 7. Therefore, the Trustee argues, the Court should annul the obligation, set aside the security interests, and order Barclays to return to the estate all amounts paid on its claim since Morse filed its bankruptcy petition, plus all interest and costs it has charged and been paid on the loan. In the alternative, the Trustee also argues under 11 U.S.C. § 510(c) that Barclays' liens should be set aside and its claim subordinated to the claims of unsecured creditors. Barclays denies the allegations and interposes several affirmative defenses.

This memorandum of decision sets forth the Court's findings of fact and conclusions of law on the Trustee's objection to Barclays' claim. The Court concludes that judgment should enter for Barclays on each count asserted by the Trustee.

## PROCEDURAL HISTORY

### a. *Sale*

Morse filed its petition for relief under Chapter 11 of the Bankruptcy Code on January 28, 1987. While in Chapter 11, Morse remained a debtor-in-possession and continued its manufacturing operations until the summer of 1987. That summer, in a sale conducted under 11 U.S.C. § 363, Morse sold its manufacturing operations, including most of its assets, to M.T.I. Holding Corporation ("M.T.I."). The Bankruptcy Court approved the sale with a "Confirmatory Order" dated June 15, 1987 (Ex. 68) and a further "Order Amending Order Authorizing Sale" dated June 25, 1987 (Ex. 73).

The Confirmatory Order, as amended, authorized Morse to transfer Barclays' collateral to M.T.I. Holding Corporation free and clear of Barclays' liens. It also permitted payment of Barclays' secured claim out of the proceeds of the sale and set forth a procedure for adjudicating that claim. (Ex. 73, pp. 2–3.)

In accordance with this order, M.T.I. paid Barclays $3,625,000 on its claim.[2] And Barclays furnished a payoff letter to the Official Committee of Unsecured Creditors.[3] The letter asserts and itemizes a total secured claim of $3,655,855.25, acknowledges payment from M.T.I. of $3,625,000.00, and reports an unpaid balance of $30,855.25.

### b. *Objection to Claim and Responsive Pleadings*

On August 27, 1987, and within the time prescribed in the Confirmatory Order, the Creditors Committee and David J. Ferrari, as Chapter 11 Trustee of Morse Tool, Inc.,[4] filed jointly their Objection to Secured Claim of Barclays American/Business Credit, Inc. Barclays filed a Response to the Objection on September 23, 1987, and, with the Court's permission, an amendment to the Response on October 1, 1987. Then, on October 29, 1987, the Court, for ease of administration, ordered that the contested matter commenced by the Objection to Secured Claim be converted to an adversary proceeding under Bankruptcy Rule 7001.

---

**2.** Although M.T.I. paid the monies directly to Barclays, they were understood to be proceeds of the sale and were paid on behalf of the bankruptcy estate. Thus, as is contemplated in the orders approving the sale, if the Trustee's objection to Barclays' claim is sustained, the amount found to have been overpaid will inure to the benefit of the estate, not of M.T.I.

**3.** The letter is attached as Exhibit B to the original Objection to Secured Claim of Barclays American/Business Credit, Inc., which was filed jointly on August 27, 1987, by the Official Committee of Unsecured Creditors and David J. Ferrari, in his capacity as Chapter 11 Trustee.

**4.** Ferrari was appointed Chapter 11 Trustee in this case on July 16, 1987.

On November 18, 1987, with the Court's permission, David Ferrari, in his capacity as Interim Chapter 7 Trustee, filed an Amended Objection to Barclays' secured claim. Barclays filed its answer to this pleading on March 31, 1988. And finally, on July 21, 1988, Ferrari, this time in his capacity as Chapter 7 Trustee,[5] filed a Second Amended Objection and Adversary Complaint to Secured Claim of Barclays American/Business Credit, Inc. Barclays filed its answer to the Second Amended Objection and Adversary Complaint on August 19, 1988.[6]

### c. *Claims and Defenses*

The only unresolved objections to Barclays' claim are objections to the claim as a whole.[7] In the payoff letter, Barclays asserts a secured claim in the total amount of $3,655,855.25. In objection, the Trustee argues that Barclays' claim, which arose from the loan it made in August, 1984, was thus part of a leveraged buy-out ("LBO") in which Barclays and G & W drained Morse of its equity and gave it nothing in return but control of its own stock. Neither G & W nor Barclays gave Morse fair consideration for the notes and security interests they received. Rather, the LBO rendered Morse insolvent and left it with unreasonably small capital to carry on its business. Moreover, Barclays participated in this LBO with actual intent to hinder, delay, and defraud Morse's creditors.

On the basis of these allegations, the Trustee argues that Morse's obligation to Barclays and Morse's conveyance of security interests to Barclays were fraudulent under sections 4, 5, and 7 of the Uniform Fraudulent Conveyance Act (UFCA) as adopted in Massachusetts, G.L. c. 109A, §§ 4, 5, and 7. Therefore, the Trustee argues, the Court should annul the obligation, set aside the security interests, and order Barclays to return to the estate all amounts paid on its claim since Morse filed its bankruptcy petition, plus all interest and costs it has charged and been paid on the loan. In the alternative, the Trustee argues under 11 U.S.C. § 510(c) that Barclays' liens should be set aside and its claim subordinated to the claims of unsecured creditors.[8]

Barclays denies the allegations on which these causes of action are founded. Contesting the Trustee's characterization of the August 1984 transaction as an LBO and a stock sale, Barclays argues that the transaction was simply an asset sale in which Morse received fair consideration in the form of the assets it received from G & W.

Barclays also interposes three affirmative defenses. First, Barclays argues that it did not act with actual fraudulent intent and, therefore, under G.L. c. 109A, § 9(2), may retain its property and obligation as security for repayment. Second, Barclays argues that as a result of a release given by Morse, as Debtor–in–Possession, to Gulf & Western, Inc. (as successor in interest to Gulf & Western Mfg. Co.), the Trustee's fraudulent conveyance and equitable subor-

---

**5.** The case was converted to one under Chapter 7 on October 30, 1987. Upon conversion of the case to Chapter 7, David Ferrari was appointed Interim Chapter 7 Trustee and later was appointed Chapter 7 Trustee. As such, he is the successor in interest of the Official Committee of Unsecured Creditors and is now the sole Plaintiff/Objector in this adversary proceeding.

**6.** Barclays also filed a third-party complaint against Gulf & Western, Inc., but the Court dismissed the third-party action for lack of subject-matter jurisdiction.

**7.** The Trustee's Second Amended Objection and Adversary Complaint contains, in paragraphs (1) through (7), seven objections to specific items in Barclays' claim. By virtue of stipulations filed in this proceeding and approved by the Court, the parties have resolved these objec-

tions. Pursuant to the stipulations, Barclays paid the Trustee $163,012.00. The parties agree that Barclays is entitled to a credit in this amount against the judgment, if any, that enters against it in this adversary proceeding.

**8.** The Trustee's Second Amended Objection and Adversary Complaint also states, as a further objection to claim, that the transaction that forms the basis of Barclays' claim was an unfair and deceptive business practice that proximately and foreseeably injured Morse's creditors, and that, under state law, Barclays is liable to the estate for such injury. The Trustee, however, has not pressed this objection to claim and has omitted it from his proposed findings of fact and conclusions of law.

dination claims against Morse have also been released. And third, as a result of the compromise agreement in which the above release was given, the Trustee's claims against Barclays have been satisfied.

### d. *Preliminary Motions and Rulings*

Upon pretrial motions for partial summary judgment, the Court has ruled on certain discrete issues of law. The Court ruled that the Trustee's fraudulent conveyance claims are governed by Massachusetts law and that qualified unsecured creditors exist with respect to the Trustee's fraudulent conveyance claims under G.L. c. 109A, §§ 5 and 7, and, therefore, that the Trustee has authority under 11 U.S.C. § 544(b) to proceed under those sections. The Court's rulings on these issues, which are set forth in memoranda and orders issued on December 22, 1989, are hereby incorporated by reference into this memorandum. 108 B.R. 384. However, the Court's rulings with respect to motions for partial summary judgment that were denied—those addressing the issues of release, satisfaction, and the existence of qualified unsecured creditors under G.L. c. 109A, § 4—are not carried forward but instead are superseded by the rulings in this memorandum.

### e. *Trial*

The evidence received in the trial of this adversary proceeding consists of ten days of trial testimony, the deposition testimony of eighteen witnesses (submitted in lieu of live testimony by agreement of the parties), and 116 trial exhibits. The evidence also includes a stipulation as to certain facts relating to the transaction of August 24, 1984; the stipulation was received into evidence as the first exhibit.[9]

The Trustee submitted by affidavit the direct testimony of four expert witnesses: Allen Michel (Exs. 100 and 101), Robert Elliott (Ex. 97 and 98), Edward Burrows (Ex. 106), and Israel Shaked (Ex. 117).[10] These witnesses were made available for cross-examination in court, and Barclays was in each case afforded an opportunity to raise evidentiary objections to the testimony in the affidavits. Barclays placed in evidence the deposition testimony of its only expert witness, Harvey Creem (Ex. 116 A, B, and C).

Barclays' filed a Motion in Limine to Exclude Evidence of the "Liquidation Value" of Inventory and Any Opinion Testimony Based Thereon. The issues raised by the motion are addressed in the parties' posttrial briefs, and the Court will rule on them in this memorandum.

The parties have submitted proposed findings of fact and conclusions of law, and they have responded to each other's proposed findings and conclusions.

### JURISDICTION

This proceeding is a proceeding to allow or disallow a claim, to determine, avoid, or recover a fraudulent conveyance, to determine the validity and priority of a lien, and to subordinate a claim. In all these respects, this a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (2)(B, H, K, and O). Therefore, the Bankruptcy Court may hear and determine all aspects of this proceeding and enter appropriate orders and judgments in it, subject to review under 28 U.S.C. § 158. 28 U.S.C. § 157(a) and (b)(1); 28 U.S.C. § 1334.

### RELEASE

Barclays first raises the affirmative defense of release. Barclays argues that under Massachusetts law, the release of one joint obligor releases all joint obligors un-

---

9. The evidence will be cited as follows. The transcript will be cited by date and page; for example, "Tr. 11/16/90, p. 12." The exhibits will be cited by number as "Ex. __"; but the Stipulation, which is exhibit 1 and contains numerous exhibits of its own, will be cited as "Stip." and the exhibits therein as "Stip., Ex. __." Likewise, the various depositions, and their pages and exhibits, will be cited by the deponent's name: "Broderick Dep., p. 20 and Ex. 15."

10. This affidavit was filed in the adversary proceeding as document number 312 on the docket. By inadvertence, it was not marked as an exhibit at trial, but, having been received into evidence, it clearly should have been. The Court now designates Professor Shaked's affidavit as Ex. 117.

less the release itself shows a contrary intent. *Hale v. Spaulding,* 145 Mass. 482, 483, 14 N.E. 534 (1888). Therefore, since the release that Morse Tool, Inc., as Debtor–in–Possession, gave to Gulf & Western, Inc. said nothing with respect to joint obligors, and the Trustee has presented no extrinsic evidence of the parties' intent, the release has extinguished the claims that are the subject of this litigation.

The Trustee argues in response that the Court should apply not Massachusetts law but federal common law, under which a party is deemed to have released only those other parties whom it intended to release; and since Barclays has presented no evidence that the parties to the release intended to release Barclays, it should not be construed as releasing Barclays. The Trustee also argues that even if the issue is controlled by the law of Massachusetts, the law and results are the same.[11]

*Findings of Fact Regarding Release Issue*

The release on which this affirmative defense is founded was given by the Debtor to Gulf & Western, Inc.[12] in conjunction with a compromise of all claims between Gulf & Western and the Debtor, which, as Debtor–in–Possession, was acting as representative of its bankruptcy estate.[13] And this compromise, in turn, was reached in conjunction with—and to facilitate—a sale of most of the Debtor's assets to MTI, Inc. The Debtor gave notice of the compromise to its creditors in a Notice of Intended Compromise (Ex. 62). In relevant part, the Notice stated:

The Debtor shall execute and deliver to G & W general releases and waivers of all claims and causes of action which it or the estate may have against G & W, including, without limitation, all claims and causes of action with respect to fraudulent conveyances and equitable subordination.

The Notice said nothing more about the release. It included no indication that the Debtor intended to release Barclays from any claim the estate might have against it. The Notice added that the compromise would become effective upon approval thereof by the Bankruptcy Court and consummation of the proposed sale of assets to MTI, and that upon becoming effective, the compromise would be binding upon the Debtor and the bankruptcy estate, any successor to the Debtor, including any trustee who may be appointed in the case, and all creditors and equity security holders. I have no evidence that the parties to the agreement gave any notice whatsoever—either in the Notice of Compromise or otherwise—to the Creditors' Committee or to any of the Debtor's creditors and equity security holders that the release was intended to extinguish the estate's claims against Barclays.

On June 10, 1987, after a hearing on the Notice of Intended Compromise, the Bankruptcy Court entered an order (Ex. 66) approving the compromise and authorizing the Debtor to execute whatever documents were necessary to effectuate the compromise. Accordingly, on June 15, 1987, the Debtor executed a document entitled General Release from Debtor in Possession (Ex. 82) ("the release"). In relevant part, the release stated:

Morse Tool hereby releases Gulf & Western from any and all claims, rights, demands, causes of action and liabilities existing as of the date hereof, whether now known or unknown, which Morse

---

**11.** The Trustee makes two additional arguments that I need not address. First, even if Barclays is correct as to the governing law, the rule does not apply because Barclays and G & W were not joint obligors. And second, Barclays is estopped from raising the release issue because, while the release was being negotiated, Barclays represented to Mark Berman, who was then counsel to the Creditors' Committee, that the release would not affect whatever claims the creditors might have against Barclays, and the Committee relied on these representations in assenting to the release.

**12.** The release was given to Gulf & Western, Inc. as successor in interest to Gulf & Western Manufacturing Company, of which Gulf & Western, Inc. had by then divested itself.

**13.** No document memorializing the compromise agreement between the Debtor and G & W was introduced into evidence in this adversary proceeding.

Tool or its estate may have against Gulf & Western, whether relating to the Agreement for Sale, any matter or transaction in connection therewith, or any other matter, and including, without limitation, all avoiding powers, all rights to seek subordination, all claims arising under or related to Bankruptcy Code Sections 544, 547, 548, 549, 550, or other fraudulent conveyance law, and all claims related to the "leveraged buyout" nature of the transactions effectuating the Agreement for Sale.

The release did not mention Barclays or express any intent to release Barclays from any claims, joint or otherwise. Nor did it contain a reservation of rights against Barclays.

In summary, I find no evidence that the parties to the compromise, the Debtor and Gulf & Western, intended by the compromise or by the release to extinguish the estate's claims against Barclays.[14] Neither is there evidence that the parties to the compromise intended that the estate would reserve its rights against Barclays. The record contains no evidence that the parties to the compromise agreed upon, discussed, or even considered the effect of the release on the estate's claims against Barclays. The issue simply was not addressed.

*Rulings of Law Regarding Release Issue*

Since I have no evidence that the parties to the compromise intended for the release to extinguish the estate's claims against Barclays, Barclays can prevail on this affirmative defense only if the issue is governed by Massachusetts law as I construed it in my 1989 memorandum of decision on the parties' cross-motions for summary judgment on the release issue. There I construed Massachusetts law as follows:

Under Massachusetts law, the release of one joint obligor releases all unless the parties to the release agreement explicitly agreed otherwise. The intent of the parties' governs; but where the parties to the agreement failed to address and agree upon its effect on joint obligors, the release is deemed to release all joint obligors.

If this were the governing law, Barclays would prevail on this defense to the extent that the Trustee's claims against Barclays are claims for which Gulf & Western would be jointly liable. Barclays would prevail because the record contains no evidence that the parties to the agreement considered or agreed upon its effect on the claims against Barclays, and under the above construction of Massachusetts law—which I will call the "old rule"—a release that does not expressly reserve rights against joint obligors is deemed to release them.

 The Trustee argues that the issue is governed by federal common law, not Massachusetts law, but also that under either law, the old rule has been replaced. The Court agrees that neither the federal common law nor Massachusetts law any longer sanctions use of the old rule.[15] Under the federal common law, "a party releases only those other parties whom he intends to release." *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed.2d 77 (1971). Accordingly, in *Zenith,* the Supreme Court rejected the old rule and held that a release agreement that failed to address its effect on a particular joint obligor did not release that obligor. And the First Circuit Court of Appeals recently (after I issued the above memorandum of decision) held that the Massachusetts courts, too, would apply the modern rule: a release has the effect of releasing joint obligors only to the extent the terms of the agreement so provide. *Hermes Automation Technology v. Hyun-*

---

**14.** Barclays does not contend otherwise. In its Requested Findings of Fact, Barclays does not request a finding that the parties to the compromise intended to release Barclays.

**15.** The Court rejects Barclays' contention, implicit in its arguments on this issue, that the old rule—the interpretation of Massachusetts law I set forth in my memorandum of decision on the cross-motions for summary judgment on the release issue—should be deemed the unalterable law of the case. The cross-motions for summary judgment were denied, so my rulings on them were in no sense final. I did not in my memorandum of decision on those motions foreclose the parties from later making further arguments as to the relevant law, especially as to binding decisions, such as *Hermes,* issued in the interim.

dai Electronics Industries Co., Ltd., 915 F.2d 739, 746 (1st Cir.1990). And, as with other questions of contract interpretation, "whether the agreement provides for the release of the joint obligor is generally determined by the intent of the parties to the agreement," id., which, in turn, is "generally determined with reference to all the circumstances surrounding the making of the agreement, as well as the actual language of the agreement." Id. at 747.

■ The issue is governed either by federal common law or by Massachusetts law. I need not decide which of these controls [16] because under either law, the Trustee would prevail. In both cases, a release of one joint obligor is not deemed to release the other except where that was the intent of the parties to the release agreement. Having no evidence of intent on the part of the Debtor or of Gulf & Western to release Barclays from its joint liabilities, I conclude that the release did not inure to Barclays' benefit. Therefore, the Court must address the claims that the Trustee asserts against Barclays.

## GENERAL FINDINGS OF FACT

The principal factual issues raised by the pleadings are (1) whether Morse received adequate consideration for the obligations it incurred and the security interests it granted in the buyout and (2) whether the buyout left Morse with unreasonably small capital for the business in which it was engaged and rendered Morse unable to pay its debts as they came due over the seven-year term of the promissory note it gave to G & W. These issues require findings as to the structure of the transactions that constituted the buyout, the values of the assets acquired and debts assumed in the buyout, Morse's financial history, its prospects for success at the time of the buyout, and its subsequent performance and fail-

ure. The following are the Court's findings on these issues.

### The Purchase Transactions

1. Morse Tool, Inc., purchased the Morse Cutting Tool and Super Tool Divisions of G & W through an integrated series of transactions, most of which transpired at a closing conducted on August 23 and 24, 1984. The closing consisted of three major events: (1) G & W's spin-off of its Morse Cutting Tool and Super Tool Divisions into a separate, wholly-owned subsidiary, Morse Tool, Inc. ("Morse"); (2) G & W's sale of Morse to MCT, Inc.; and (3) the execution of a loan agreement between Morse and Barclays. The purchase was completed by two postclosing transactions: Morse's merger with MCT, Inc., and the completion by Morse and G & W of a purchase-price adjustment process.

2. At all relevant times before the closing, Morse Cutting Tool and Super Tool were unincorporated divisions of G & W. (Stip. ¶ 3)

3. At all relevant times before the closing, both Morse Tool, Inc. and MCT, Inc., were merely shell corporations: they had neither assets nor liabilities and had not engaged in any business. (Stip. ¶¶ 5, 7; Rohr Dep. pp. 59–60) Morse's board of directors consisted of representatives of G & W and/or of its parent, Gulf and Western, Inc. (Stip. ¶ 10(a)) MCT did not become liable for the expenses associated with the acquisition—the attorney's and accountant's fees and Barclays' lending fees—until the closing. Had the acquisition not occurred, neither MCT nor Morse would have become liable for these expenses. Both Morse and MCT were incorporated in Michigan on April 25, 1984, by B. Lynn Fowler, an associate at the law firm that represented James Lambert and

16. The issue has not been fully briefed. The release itself states, "[t]his Release shall be governed by and construed in accordance with Massachusetts law," but the release itself is signed only by the Debtor, so it is not clear whether this choice-of-law clause represents the intent of both parties to the compromise. If it did, the Court would likely respect their choice. On the other hand, the release was given by the Debtor-in-Possession in a federal bankruptcy proceeding pursuant to a compromise, the approval of which was governed by federal procedural law, Bankruptcy Rule 9019(a); and the release affected claims arising not only under Massachusetts law, but also under federal bankruptcy law. Therefore, absent an overriding choice-of-law in the release agreement, the Court would likely apply federal common law.

MCT, Inc., in the purchase transactions. (Stip. ¶¶ 5–6; Rohr Dep. pp. 13, 52, 59)

4. James Lambert and G & W structured the purchase and sale of the Divisions to occur in two steps, which occurred in the following order.

5. In the first step, the "spin-off," G & W assigned most of the assets of its Morse Cutting Tool and Super Tool Divisions to Morse Tool, Inc., subject to most of the Divisions' liabilities; and, in exchange, Morse issued to G & W all Morse's outstanding shares of stock, consisting of ten shares of common stock. (Stip. ¶ 10) This transfer occurred at the closing and is memorialized in a Bill of Sale and Assignment and Assumption Agreement between Morse and G & W. (Stip. Ex. C) The spin-off transformed the unincorporated divisions into one incorporated, wholly-owned subsidiary of G & W.

6. The second step was G & W's sale of Morse to MCT, Inc. The sale of Morse to MCT was governed by an Agreement for Sale of All Shares of Morse Tool, Inc., dated August 24, 1984, which MCT and G & W executed at the closing. Pursuant to the Agreement for Sale, G & W transferred its stock in Morse to MCT, Inc. And, in exchange, MCT paid the purchase price of $10,410,000 by giving to G & W a demand promissory note dated August 24, 1984, in the principal sum of $10,410,000. (Stip. ¶ 10(b)) Then, after Morse entered into a loan agreement with Barclays, MCT paid the $10,410,000 demand note by giving G & W cash of $3,821,000 and two promissory notes: a Purchase Price Promissory Note for $6,417,000, and a Slow–Moving Inventory Promissory Note for $172,000. All the events described in this paragraph occurred at the closing. (Stip. ¶¶ 11–13)

a. The Purchase Price Promissory Note [17] provided for payment of principal in five equal annual installments commencing on November 24, 1986, with each annual installment being 10 percent of the original principal amount of the respective note, and with the balance of 50 percent of the original principal amount due on November 24, 1991. Under each note, interest accrued at 10 per cent per annum, with all interest from the date of the closing through August 24, 1986, being due on August 24, 1986. At Morse's option, however, payment of the interest due on August 24, 1986, could be paid in five equal installments of 10 percent commencing on August 24, 1986, with the balance of 50 percent payable on August 24, 1991, with interest on the unpaid balance to accrue at 10 per cent per annum. (Stip. ¶ 12(b))

b. The Slow–Moving Inventory Promissory Note was a non-interest bearing note. It provided that its principal was to be paid by payments of $86,000 on each of February 24, 1986, and August 24, 1987. (Stip. ¶ 13)

7. At the closing, Morse guaranteed the promissory notes given by MCT to G & W; and Morse secured the guarantees by granting to G & W a security interest in all of Morse's machinery, equipment, and slow-moving inventory, and by giving to G & W mortgages on Morse's real estate in Elk Rapids, Michigan, and New Bedford, Massachusetts. (Stip. ¶¶ 12, 13, 15)

8. Also at the closing, MCT gave G & W an Undertaking, and Morse gave G & W a guarantee of the Undertaking. In the Undertaking, MCT undertook to deliver to G & W, on the fifth anniversary of the closing, either (a) $2,100,000, plus accrued interest at the rate of ten percent per annum, or (b) certification that certain pension plans covering the Morse employees had, since the closing, met certain minimum funding standards. (Stip. ¶ 14, Ex. G)

9. At the closing and in conjunction with G & W's transfer of its stock interest in Morse to MCT, G & W's right to receive the original issue of ten shares of common stock in Morse was cancelled; a certificate for these ten shares was issued to MCT; Morse's board of directors resigned; and MCT elected James Lambert as the sole member of Morse's board of directors. (Stip. ¶ 11(a))

---

**17.** Later, the Purchase Price Promissory Note was replaced with a substitute Purchase Price Promissory Note. The substitute note had the same payment terms as did the original.

10. Morse financed the $3,821,000 cash payment to G & W by entering into a General Loan and Security Agreement (the "Loan Agreement" [18]) with Barclays. In the Loan Agreement, which Morse and Barclays executed and delivered to each other at the closing, Barclays agreed to provide loans to Morse of up to $5 million at the interest rate of the prime rate plus 3.5 per cent per annum. To secure Morse's obligations to Barclays under the Loan Agreement, Morse gave Barclays a security interest in its accounts receivable and inventory. (Stip. ¶¶ 19–21) The initial advance under the loan consisted of the $3,821,000 used to finance the cash payment to G & W. The remainder was to be advanced later on a revolving basis and at Barclays discretion to help meet Morse's needs for working capital during the life of the loan. (Stip. ¶¶ 19–21)

a. The loan agreement required, in addition to interest, that Morse pay Barclays an unconditional fee of $75,000, payable in three installments: $25,000 payable on acceptance of the commitment letter, and payments of $25,000 on both January 31 and February 28, 1985. James Lambert made the initial payment with his own funds, and this payment became part of his $100,000 equity contribution to Morse.

b. The loan agreement had a minimum duration of three years and was to continue from year-to-year thereafter unless and until terminated by either party either at the end of the initial three-year period or on any yearly anniversary thereafter.

c. Morse's obligations to Barclays under the loan agreement were payable on demand.

d. The loan agreement provided that Barclays would make advances to Morse entirely at Barclays' discretion. It also set a general lending cap of $5,000,000 and further provided that Barclays would make advances only in accordance with a lending formula. Under the formula, total outstanding advances at any time would not exceed the total of 80% of the face value of eligible accounts receivable plus 50%—up to a cap of $2,000,000—of the value (the lower of cost or market) of eligible inventory. In addition, the loan agreement provided that the overall cap of $5,000,000 would be lowered by $500,000 until the Debtor successfully negotiated two collective bargaining agreements that were due to expire in October, 1984, and May, 1985. And the cap was to be reduced by another $250,000 for thirty to forty-five days after the closing to encourage the Morse to "stretch the trade"—that is, to increase the average time in which Morse was paying its trade payable.

11. To further secure Morse's obligation to Barclays under the loan agreement, both James Lambert and MCT guaranteed Morse's obligations to Barclays. (Stip. ¶¶ 20, 21)

12. The Trustee and Barclays agree that the accounts receivable and inventory pledged to Barclays in the Loan Agreement and the real estate, machinery, and equipment pledged to G & W in conjunction with the Sale of all Shares were unencumbered before they were so pledged. (Barclays' Requested Findings of Fact, ¶¶ 18–19; Trustee's Proposed Findings of Fact and Rulings of Law, ¶ 99) There is no evidence that any of the assets Morse acquired from G & W were subject to security interests just prior to their acquisition.

13. Also at the closing, Barclays and G & W entered into an Inter–Creditor Agreement. The Agreement defined their rights and priorities vis-a-vis each other as secured creditors of Morse. (Stip. ¶ 23 and Ex. O thereto)

14. At the closing and pursuant to the Loan Agreement, Barclays transferred by wire to Gulf & Western, Inc. the sum of $3,821,000, representing the cash portion of the purchase price, which Gulf & Western, Inc. credited to G & W's intercompany account. (Stip. ¶ 22)

---

18. In addition to the General Loan and Security Agreement, Morse and Barclays also executed an Overall Rider to General Loan and Security Agreement and a Patent Mortgage and Security Agreement. All three are dated August 24, 1984. They shall be referred to collectively as the Loan Agreement.

15. The above events and transactions that occurred at the closing were intended by the various parties thereto to occur on the same day, August 24, 1984. (Stip. ¶ 30) And although it was not the parties' intent that the closing transactions would occur contemporaneously, it was their understanding and intent that they would occur together, in the sequence in which they occurred—first the spin-off and then the sale—as an integrated whole. (Rohr Dep. pp. 61–63)

16. After the closing, by a Certificate of Merger dated September 27, 1984, and filed with the Michigan Department of Commerce on October 24, 1984, MCT merged into Morse Tool, Inc., leaving Morse as the surviving entity. (Stip. ¶ 27 and Exs. A–B)

17. After the closing and pursuant to a "true-up" process prescribed in the Agreement for Sale of All Shares of Morse Tool, Inc., the purchase price of Morse Tool, Inc., was increased by $300,000. On December 12, 1984, Morse compensated G & W for this increase by replacing the original Purchase Price Promissory Note in the amount of $6,417,000 with a substitute Purchase Price Promissory Note in the amount of $6,717,000. The substitute note had the same payment terms as did the original. (Stip. ¶ 12(a))

18. At the time of and following the closing, G & W was fully solvent. (Stip. ¶ 17) Moreover, the Court has received no evidence tending to indicate that G & W (and its successors and assigns) ceased to be liable for the G & W liabilities and debts that Morse assumed in the transactions at the closing, or that G & W intended not to honor any such liabilities and debts if Morse failed to satisfy them.

*The Divisions' Predivestiture Performance*

19. At all relevant times before the 1984 divestiture, Morse Cutting Tool and Super Tool were unincorporated divisions of G & W, but G & W operated them together as a separate and distinct unit within G & W. This unit maintained its own business records and financial statements. The parties have submitted evidence of the Divisions' financial performance for fiscal years [19] 1979 through 1984, though the evidence for the years before 1982 is thin. (Ex. 38 is a collection of the Divisions' consolidated financial reports from August, 1982, through August, 1984.) I have no evidence of the Divisions' financial history before 1979.

20. Although the Divisions operated together as a distinct unit and kept their own consolidated financial reports, the reports cannot easily be compared to those of an independent corporation. When reading the statements (especially the income statements) to determine the Divisions' viability as an independent corporation, a reader must keep several factors in mind:

a. First, in comparison with the debt burden that Morse would incur in the buyout, the predivestiture burden was negligible; between 1981 and 1984, annual interest expenses ranged from a low of $66,000 to a high of $82,000. (Gagnon Dep., Ex. 20, p. 15; Ex. 38)

b. The Divisions paid no income taxes on their profits; G & W paid the income taxes, so these did not factor into the Divisions' income statements. Neither party has estimated what the Divisions' profits would have been after taxes.

c. The Divisions maintained a "zero balance" intercompany account with G & W. This meant that when the Divisions had excess cash, G & W siphoned it away, and when the Divisions needed cash, such as to fund losses or to overcome cash flow problems, G & W would supply it. (Tr. 12/14/89, pp. 53–54) Moreover, during the early 1980s, G & W made very little capital investment in the Divisions. This makes it very difficult to determine how the Divisions might have fared during these years had they, like an independent corporation, been permitted to retain some of their profits and make capital investments.

---

**19.** Fiscal years began on August 1 and ended on July 31; and the fiscal year number is the calendar year in which the fiscal year ended. Thus, FY 1979 began on August 1, 1978, and ended on July 31, 1979.

d. Each year, the Divisions paid to G & W an administrative cost allocation fee. This was the portion of G & W's headquarters' administrative costs that G & W assessed against the Divisions. This fee varied from year to year:

| FY | Fee |
|----|-----|
| 1981 | $728,000 |
| 1982 | 691,000 |
| 1983 | 584,000 |
| 1984 | 164,000 |

(Ex. 99, p. 15; Ex. 38)

21. As the Trustee has emphasized, the Divisions operated in the predivestiture years with several disadvantages: an inefficient plant, high labor costs, and a rigid industry price structure.

a. The Morse Cutting Tool facilities in New Bedford consisted of two old multistory buildings through which materials had to be trucked by elevator, making the manufacturing process less efficient and more labor-intensive than would be necessary in a one-story facility. (Tr. 9/27/89, p. 133; Tr. 10/23/91, pp. 86–87) Consequently, the New Bedford plant—which accounted for approximately 80% of the Divisions' production and sales—was a high-overhead plant, which, for that reason, needed a higher volume of business than did other plants to be profitable. (*Id.* at 133) This made the Divisions more vulnerable than were many of their competitors to recessions and decreases in sales volume.

b. The Divisions' labor costs, too, contributed to their overhead problem and their competitive disadvantage. In 1984, the Divisions' labor costs were approximately the second highest among the approximately 12 major domestic competitors in the cutting tool industry. (Lambert Dep., 8/9/88, pp. 14–15 and Ex. B) They paid their hourly employees total wages and benefits of between $15.60 and $16.00 per hour; most competitors paid around $14.00, and some paid significantly less—as low as $11.00 per hour. (Lambert Dep., 5/17/88, pp. 19–20) In 1982, G & W sought union wage concessions of $4.00 per hour but, after a lengthy strike at the New Bedford plant, obtained no concessions; rather, the company and the Union entered into a three-year collective bargaining agreement under which benefits increased slightly and wages remained the same. (Tr. 9/27/89, p. 40) Two years later, in May of 1984, when James Lambert was negotiating to purchase the Divisions, he asked the Union for a fifteen percent reduction in wages and benefits. (Lambert Dep., 5/17/88, p. 18) Even in view of the Divisions' uncertain future, the Union denied his request. (Lambert Dep., 8/9/88, p. 24) Thus, at the time of the buyout, the Divisions had little realistic hope of lowering their labor costs.

c. The Divisions manufactured standard cutting tools that never changed in design and that were virtually identical to the products manufactured by their many competitors. (Tr. 6/4/90, pp. 52–54) Competition was based solely on price and availability, and the market strictly controlled the prices the Divisions could charge. (Lambert Dep., 5/17/88, pp. 176–177) The Divisions therefore could not increase prices to compensate for their higher-than-average costs of production. (Lambert Dep., 8/9/88, p. 29) In fact, in May, 1984, the Divisions attempted to increase their prices by 5% but ultimately abandoned the effort because they felt the market would not bear it. None of their competitors were raising prices at that time. (Lambert Dep., 5/17/88, p. 177; Lambert Dep., 8/9/88, pp. 28–29)

d. I find the evidence thin and inconclusive with respect to the Trustee's additional contention that Morse's equipment was antiquated and poorly maintained. G & W's failure to invest in new machinery in the years before the buyout created occasional production problems but did not seriously handicap the Divisions. Their major problems were plant design and labor costs.

22. The gross margin (or gross profit margin) is the difference between net sales and the cost of goods sold. It can be expressed either in dollars or as a percentage of net sales. From the gross margin a company must pay various nonproduction-related expenses, including selling expenses, debt service, and income taxes. If these exceed the margin, the corporation incurs a net loss for the year, as the Divi-

sions did in fiscal years 1982 through 1984. The Divisions' margins in fiscal years 1981 through 1984 were as follows:

| FY | Net Sales | Cost of Goods Sold | Gross Margin | Percent |
|----|-----------|--------------------|--------------|---------|
| 1981 | $40,074,000 | $33,668,000 | $6,406,000 | 16.0% |
| 1982 | 32,323,000 | 29,259,000 | 3,064,000 | 9.5 |
| 1983 | 21,944,000 | 22,740,000 | (796,000) | (3.6) |
| 1984 | 25,884,000 | 24,364,000 | 1,520,000 | 5.9 |

(Ex. 38; Ex. 99, pp. 13A and 14) As a result of its inefficient plant and high labor costs, the Divisions' gross margin of 5.9% in the fiscal year that ended 24 days before the buyout, FY 1984, was, in the words of the Trustee's experts, "minuscule," "critically small," and "too slim for profitable operations, even before imposing large new debt service costs." (Elliott Affidavit, p. 10; Michel Affidavit, p. 17) And the gross margin in the preceding year was substantially worse. These figures also corroborate the observation made above that the Divisions' needed a high level of sales—somewhat in excess of the $32.3 million achieved in FY 1982—in order to attain the margins needed to operate profitably.

23. The Divisions' had profitable years in fiscal years 1979, 1980, and 1981. (Tr. 9/27/89, p. 130; Barclays' Prospect Audit, Gagnon Dep., Ex. 20, p. 15; Ex. 113, "Morse Information Sheet") Their net sales, operating income,[20] and operating profits during those years were as follows:

| FY | Net Sales | Operating Income | Operating Profits |
|----|-----------|------------------|-------------------|
| 1979 | $41,144,000 | $4,132,000 | —— |
| 1980 | 43,264,000 | 3,886,000 | —— |
| 1981 | 40,074,000 | 2,632,000 | $1,838,000 |

(Ex. 113, "Morse Information Sheet"; Tr. 10/23/91, p. 144; Gagnon Ex. 20, p. 14) But in the three fiscal years immediately preceding the divestiture, they lost a total of $6,082,000.[21]

| FY | Net Sales | Losses |
|----|-----------|--------|
| 1982 | $32,323,000 | ($1,008,000) |
| 1983 | 21,944,000 | (4,101,000) |
| 1984 | 24,035,000 | (973,000) |

20. Operating income is not the same as operating profits or net profits. Operating income is equal to net sales minus the cost of goods sold, selling expenses, and administrative expenses, but it reflects no deductions for interest expenses, G & W's administrative cost allocation, and income taxes. Operating profit is equal to operating income minus interest expenses and G & W's administrative allocation, but includes no deduction for income taxes. The only profitable year for which I have evidence of operating profits is 1981. (Gagnon Ex. 20, p. 14)

21. Like operating profits, losses equal operating income minus interest expenses and G & W's administrative cost allocation and includes no deduction for income taxes (of which there would be none because taxes are assessed only on profits, not on losses).

**114**

(Ex. 113, "Morse Information Sheet"; Ex. 38) The Divisions' losses in fiscal years 1982 through 1984 were caused principally by the economic recession of the early 1980s, during which the Divisions' sales dropped precipitously, but also by a thirteen-week strike against Morse Cutting Tool in 1982 by the members of the United Electrical, Radio, and Machine Workers of America, and by problems in management.

24. By the time of the buyout, however, the Divisions' performance had improved considerably. The Divisions' income statements showed modest profits in the five months before the buyout: March through July, 1984. The Trustee contends and I find that these profits were in part—how large a part I cannot determine—illusory: because of the Divisions' standard cost accounting system, they reflected a seasonal fluctuation in production and therefore tended to overstate the Divisions' profitability in these months. (Testimony of George Perry, the Divisions' Manager of Accounting, Tr. 12/14/89, pp. 44–45, 51–52) Nonetheless, when the profit figures for 1984 are compared to those for the same months in 1983, as in this table—

| | 1983 | 1984 |
|--------|-----------|----------|
| March | ($320,000)| $34,000 |
| April | (308,000) | 59,000 |
| May | (542,000) | 4,000 |
| June | (320,000) | 128,000 |
| July | (683,000) | 40,000 |

(Ex. 38)—it becomes clear that despite seasonal distortion, the figures showed real and significant improvement. In a "prospect report" of the Divisions dated July 13, 1984, Barclays reached the conclusion that "both divisions are now (essentially) breaking even." (Gagnon Dep., Ex. 20, p. 13–A) The Court concludes that this was a fair characterization of the Divisions' performance at the immediate time of the buyout.[22] Still, the meager profits in these few months should not have inspired great confidence in long-term profitability and growth; at best they were an indication that the Divisions' performance was improving. The Divisions had not established

a record of profitability. And even their ability to break even was tenuous.

25. In fiscal years 1982 and 1983, the Divisions' net sales decreased dramatically:

| FY | Net Sales |
|------|--------------|
| 1981 | $40,074,000 |
| 1982 | 32,323,000 |
| 1983 | 21,944,000 |
| 1984 | 24,035,000 |

(Barclays' Prospect Audit, Gagnon Dep., Ex. 20, pp. 13A and 15) The Trustee argues that this reflected a long-term, one-third reduction in the Divisions' volume of sales and a significant loss of market share. I reach a less pessimistic conclusion. The evidence available at the time of the buyout suggests that the Divisions had suffered a significant sales-volume reduction and loss of market share, but also that a large portion of the loss and reduction might only be a short-term problem.

With respect to sales volume, the evidence shows that in the months preceding the buyout, sales had begun a healthy rebound:

| | 1983 | 1984 |
|----------|-------------|-------------|
| January | $ 1,774,000 | $ 2,301,000 |
| February | 1,765,000 | 2,282,000 |
| March | 1,838,000 | 2,570,000 |
| April | 2,048,000 | 2,437,000 |
| May | 1,800,000 | 2,476,000 |
| June | 1,763,000 | 2,604,000 |
| July | 1,532,000 | 1,824,000 |
| Totals | $12,520,000 | $16,494,000 |

(Compiled from net sales figures set forth in Statements of Earnings in Ex. 38) These figures show that the Divisions' sales were, on average, 32% higher in 1984 than in 1983. The Divisions' drop in sales and subsequent rebound mirrored trends in the cutting tool industry. (Barclays' Prospect Audit, Gagnon Dep., Ex. 20, p. 13A) As Edward Hirschberg[23] testified, "Morse has always been a cyclical company, and it goes up and down with the market." (Tr. 10/23/91, p. 143) Therefore, I find no reason to conclude that the drop in sales was, in its entirety, permanent or long-term.

---

22. The Court does not rely on the prospect audit in reaching this conclusion; I merely find that the audit's conclusion was accurate.

23. Mr. Hirschberg was the G & W vice president in charge of the divestiture of the Divisions. Prior to that time, he held various other high-level financial positions at G & W.

It appeared that as the industry eased out of the recession, the Divisions would likely continue to increase their sales. The Divisions would need to sustain a 32% annual growth rate—a difficult rate to sustain—for over two years to return to their 1981 sales level of $40 million. Recovery would thus take at least two years, more likely three or four, and a return to the 1981 level was by no means certain. Still, with the help of a growing economy, the Divisions' could fairly have hoped to reach 85–90% of the 1981 level in approximately three years.

The Divisions did suffer a decrease in market share from their 1982 level, which was 8.6% of domestic sales, but the amount and longevity of the decrease were uncertain. The Divisions' reported that their market share in 1984 was only 5.5% (Lambert Dep., 8/9/88, pp. 14–15 and Ex. B), but in its Prospect Loan Request of July 20, 1984, Barclays found that market share had increased to 6.8%. (Prospect Loan Request, Gagnon Dep., Ex. 3, p. 6) Thus the parties to the 1984 transaction had reason to believe that the decrease in market share was, for the most part, not long-term. More likely, it was a temporary drop, due in part to an ill-timed price increase. (Prospect Loan Request, Ex. 115, p. 6) I would estimate that only a portion of the drop—a third, approximately 1.1% of market share—was, if not "permanent," at least long-term.

26. These findings about the Divisions' predivestiture history yield the following conclusions about their financial health and viability just prior to the buyout (without the added burden of debt they would incur in the buyout, and without any price increases or cost saving measures that might be implemented after the buyout). The Divisions operated profitably before the recession and then, after the recession, returned to a "break even" level. As the economy continued to improve—the economic forecast in 1984 was optimistic (Tr. 11/16/90, pp. 31–32)—they were likely to break even in FY 1985 and to post a modest profit in FY 1986.

Just how profitable they were capable of becoming over the long run is difficult to determine. Their performance in fiscal years 1979 through 1981 indicated that they had productive capacity sufficient to meet sales of $43,000,000 and to turn annual profits (before taxes but after G & W's administrative cost allocation) in the range of $1,800,000 to $3,300,000. Nonetheless, the Divisions' experience in fiscal years 1982 through 1984 showed that they could not endure a recession without incurring substantial losses and having to draw upon capital reserves or unused borrowing capacity. Moreover, it appeared that the Divisions needed annual sales of approximately $35 million in order to turn a profit. And they needed a healthy economy to achieve this level of sales. Their high overhead and small margins made them extremely vulnerable to fluctuations in demand.

### After The Buyout: Morse Tool, Inc.

27. After the buyout, the Divisions became a new and independent entity, Morse Tool, Inc. In many ways Morse was merely a continuation of the business of the Divisions, but the buyout also effected major changes: independence from G & W, a changed balance sheet, new long-term debt, significant encumbrance of assets, new management and business plans, and changed prospects.

#### a. Morse's Postclosing Balance Sheet

28. Before the buyout, the Divisions had no separate legal existence from G & W. G & W, being solvent, could be counted on to honor the Divisions' obligations, to fund their losses when necessary, and to supply working capital when and as it saw fit. After the buyout, Morse was on its own with far more limited resources.

29. Immediately after the buyout, Morse's assets consisted almost entirely of those assets conveyed to it by G & W. Its liabilities consisted of those it assumed from G & W, plus the $10.7 million in long-term debt incurred to finance the buyout. G & W's assets were supplemented only by the additional equity contribution of $100,-

000 made by James Lambert, the sole stockholder of Morse.

30. The parties to this proceeding disagree over some items on Morse's postclosing balance sheet. What follows is a summary of the parties' positions on Morse's balance sheet as of the time immediately following the closing.

| Assets | Trustee | Barclays |
|---|---|---|
| Cash | $100,000 | $0 |
| Accounts Receivable | 2,946,000 | 2,946,000 |
| Prepaid Expenses | 11,000 | 11,000 |
| Inventory | 3,412,000 | 9,626,000 |
| Land and Buildings | 934,000 | 983,000 |
| Machinery and Equipment | 4,906,000 | 6,133,000 |
| Total Assets | $12,309,000 | $19,699,000 |
| | | |
| **Liabilities** | | |
| Assumed Liabilities | $2,558,000 | $2,557,000 |
| Retiree Benefits | 4,641,000 | 0 |
| Pension Underfunding: | | |
| PBGC Claim | 1,503,000 | 0 |
| Undertaking | 2,100,000 | 0 |
| Barclays Loan | 3,821,000 | 3,821,000 |
| G & W Notes | 6,889,000 | 6,903,000 |
| Total Liabilities | $21,512,000 | $13,281,000 |
| **Equity** | ($9,203,000) | $6,418,000 |

31. The Court's findings with respect to these balance sheet items are as follows:

A. Cash: G & W transferred no cash to Morse in the spinoff. Lambert contributed $100,000 to the newly-formed Morse, but $25,000 of this amount consisted of Lambert's preclosing payment of the first installment on Barclays' lending fee, so Morse's initial cash balance was no more than $75,000.

B. Accounts Receivable: In the spinoff, G & W transferred accounts receivable to Morse of $2,946,000. G & W guaranteed collection of these receivables in full, so it is appropriate to carry the receivables on the balance sheet at full face value.

C. Prepaid Expenses: The parties agree that G & W transferred prepaid expenses totalling $11,000.

D. Inventory: The parties' $6,214,000 disagreement over the value of Morse's inventory, though large in amount, presents only one issue: whether the inventory should be valued at "orderly liquidation value," as the Trustee contends, or at its going-concern value, as Barclays contends. Resolution of this issue requires that the Court determine a much larger factual issue: whether (and to what extent) Morse was a going concern, a viable enterprise, at the time of the buyout. I make no attempt to resolve that issue in this paragraph. Instead I want only to narrow the issue by making findings as to both liquidation value and going-concern value.

Liquidation: The Trustee argues that the liquidation value of the inventory just after the closing was $3,412,000. The figure he used for liquidation value was calculated from an appraisal performed by Paul Chellis for Barclays on July 26, 1984. At that time, Chellis was an appraiser and an employee of Barclays; he performed the appraisal for Barclays in conjunction with the Loan Agreement that was consummated at the closing. In the appraisal, Chellis determined the "orderly liquidation value" of the inventory. By "orderly liquidation value," Chellis meant the amount that would be received if the inventory were sold over

120 days to competitors, customers, or vendors, with the unsold remainder being sold at public auction. (Chellis Dep. at 24) Such a sale would be a distress-type sale, as would be conducted by a foreclosing secured creditor. (*Id.* at 16) This value can only be attained on a whole, complete inventory that has not been picked over. (Chellis Dep., Ex. 1)

Chellis did not actually appraise the inventory. Rather, he determined the percentage return on cost—the cost of manufacturing the inventory—that each category of inventory would bring. (Chellis Dep. at 30–31) Accordingly, he arrived at the following valuation:

| | | | |
|---|---|---|---|
| Finished goods: | 50–60% of cost | | |
| Raw materials: | 40–50% of cost | | |
| Work-in-progress: | No determinable value | | |

(Chellis Dep., Ex. 1)

Chellis did not conclude that Morse could not get a better return on its inventory than his orderly liquidation value. He merely determined that if the inventory were sold in such an orderly liquidation, it would bring the return he predicted. To the extent that orderly liquidation value is relevant, I accept Chellis's valuation as accurate.

Using Chellis's percentages[24] and the book values for inventory set forth in Morse's balance sheet for August 24, 1984,[25] I find that the orderly liquidation value of Morse's inventory as of August 24, 1984, was as follows:

| | Cost | Percentage | Value |
|---|---|---|---|
| Finished Goods | $4,636,000 | 60% | $2,782,000 |
| Raw Material | 1,014,000 | 50% | 507,000 |
| Supplies | 89,000 | 50% | 45,000 |
| Work-in-Progress | 3,887,000 | 0% | 0 |
| Total | | | $3,334,000 |

Therefore, the liquidation value of Morse's inventory at the time of the buyout was $3,334,000. (In arriving at this conclusion, I give no weight to the testimony of Allen Michel as to the inventory's value; Michel is not qualified as an expert appraiser.)

Going Concern: Barclays contends that the going-concern value of the inventory acquired in the buyout was its book value—the approximate cost of manufacturing the inventory—adjusted downward to account for certain stale and "slow moving" items. Thus Barclays arrives at a value of $9,626,000. I find that this is an accurate statement of the book value of the inventory and that the going concern value of the inventory is no less than this amount.

The value and method of valuation that Barclays advocates here are the same as G & W and Lambert used in calculating the inventory's value in the buyout.[26] Edward Hirschberg, who negotiated the transaction for G & W, explained how inventory was valued. The book value of the Divisions' inventory was the "standard cost" of manufacturing it, and standard cost was an approximation of the actual manufacturing cost. As the true-up shows, the book value of the "regular" inventory acquired in the buyout was $10,061,627.40. Of this total, $606,948.38 was deemed to be stale—it had not been sold within twelve months of its having been manufactured—and so no value was ascribed to it. Therefore, the net value of the regular inventory was $9,454,-

24. With respect to finished goods and raw materials, Chellis gave a range of percentages, and the Trustee uses the highest percentage in the range.

25. The total book value of inventory set forth on this balance sheet is the same as the corresponding figure on the true-up.

26. The price paid by Morse to acquire the Divisions was based in large part on the book value of the assets acquired.

679.02. In addition to the regular inventory, G & W also transferred to Morse certain "slow-moving" inventory, which had a standard cost of $513,125 but which was discounted to $172,000 for purposes of the buyout. Therefore, the total value of the inventory transferred was set at $9,626,-679.02. (Tr. 10/23/91, pp. 31–38)

If anything, this valuation of the inventory understates its going-concern value at the time of the buyout. As the Divisions' gross margins demonstrated, the Divisions sold their inventory in FY 1984 for more than the cost of producing it; even in their worst year, FY 1983, the Divisions sold their inventory for only 3.6 percent under cost, which indicates that cost serves as a fair approximation of going-concern value even in the worst of times. As the Trustee points out, certain special items were often sold at substantially below cost, but these special items enhanced the value of the inventory as a whole (Ex. 99, p. 13A); and, as a whole, the inventory sold at above cost. At the time of the buyout, the Divisions' inventory turn rate—the number of times per year that the Divisions would sell the entire value of their inventory—was 2.7. (Lambert Dep., p. 99) Therefore, the Divisions were selling their entire inventory at above cost at the rate of once every 136 days. Moreover, Barclays' valuation includes approximately $1,000,000—approximately nine percent of cost—in discounts

for stale and slow-moving items. For these reasons, I conclude that the going-concern value of the inventory acquired in the buyout is fairly approximated at $9,626,000.

E. Land and Buildings: The Trustee values the Land and Buildings at $934,000; Barclays values them at $983,000. They agree that the fair market value of the property at the time of the buyout was $983,000, but the Trustee's expert, Allen Michel, testified that this figure should be reduced by five percent to reflect a reasonable sales commission. Mr. Michel is not qualified to offer an opinion on the value of real estate, so I reject his opinion on this issue. I conclude that the fair market value of the real estate was $983,000 and make no conclusion as to liquidation value.

F. Machinery and Equipment: The Trustee would have me find that the value of the machinery and equipment at the time of the buyout was $4,906,000; Barclays contends that it was $6,133,000. Both accept as their starting point the appraisals performed for G & W by the appraisal firm of Norman Levy Associates, Inc. The appraisals were performed in September, 1982, and May, 1983, but the parties accept them as valid for the time of the buyout. In the appraisals, the firm concluded that the machinery and equipment of the Morse Cutting Tool and Super Tool Divisions had the following values:

| | MCT | Super Tool | Totals |
|---|---|---|---|
| In Place: | $5,650,000 | $1,483,477 | $7,133,477 |
| Fair Market: | 4,915,914 | 1,217,291 | 6,133,205 |
| Forced Liquidation: | 3,550,351 | — | — |

(Ex. 109, 110, and 111; Tr. 10/23/91, pp. 40–42) (The firm did not calculate the liquidation value of the Super Tool assets.) Barclays would have me adopt the fair market values. The Trustee would start with the fair market figures but reduce them by twenty percent: ten percent to account for the costs of sale and an additional ten percent because, in an orderly liquidation, the machinery and equipment

would sell for at least that much less than fair market value.

I need not decide here the legal question of whether liquidation value should govern. I merely find at this juncture that the in place, fair market, and liquidation values set forth in the Levy appraisal are accurate statements of the values of the machinery and equipment at the time of the buyout. And I also reject as unsupported by competent evidence the Trustee's contentions that

the cost of conducting an orderly liquidation sale would be ten percent of the fair market value of the machinery and equipment and that the "orderly liquidation value" (as opposed to forced liquidation value) of the machinery and equipment would be at least ten percent less than fair market value.

G. Assumed Liabilities: The parties agree that Morse assumed liabilities from G & W totalling $2,557,816.22. The major components of this liability included regular short-term accounts payable of $908,-895.41, which were to be paid in the ordinary course of business; accrued liability of $1,061,594.00 to the hourly employees' pension plan or plans, which was payable in two equal installments due in May, 1985, and May, 1986; and holiday and vacation pay to hourly employees in the amount of $313,455.18, which was due in the summer of 1985.

H. Retiree Benefits: The Trustee contends, and Barclays denies, that Morse also assumed liability in the amount of $4,641,-000 for life and health insurance benefits that G & W was obligated under a collective bargaining agreement to provide to retired employees. This dispute presents a lengthy series of factual and legal issues, which I have dealt with in Appendix A to this memorandum. For the reasons set forth there, I conclude that Morse assumed liability for certain retiree benefits having a total present value, at the time of the buyout, of $1,708,000.

I. Undertaking: The Trustee argues that Morse's postclosing liabilities included a $2.1 million obligation to G & W arising from the Undertaking. This was a contingent liability: Morse would be required to pay G & W $2.1 million only if it failed to satisfy ERISA's minimum funding requirements with respect to certain pension plans for five years. The Trustee argues that the buyout left Morse without resources to satisfy its pension funding obligations, making eventual default on the Undertaking inevitable. Barclays denies that default was inevitable and urges that the Undertaking liability be valued at zero.

This dispute, too, presents complex issues of fact and law. The Court has addressed these in Appendix B. For the reasons set forth there, the Court concludes that the Undertaking liability as of the time immediately after the buyout should be valued at zero.

J. PBGC Claim: The Trustee also contends that Morse's postclosing balance sheet included liability to the Pension Benefit Guaranty Corporation ("PBGC") in the amount of $1,503,000 under ERISA § 4062(b)(2), 29 U.S.C. § 1362(b), as that statute existed on August 12, 1984. That section defined an employer's liability to the PBGC upon termination of a single-employer pension plan. Barclays denies that Morse had any liability under this section. For reasons set forth below, the Court need not determine the amount of this liability.

K. Barclays Loan: The parties agree that Morse's liability to Barclays under the loan agreement was in the amount of $3,821,000. The terms of this loan are set forth above.

L. G & W Notes: Morse's liability to G & W under the two notes given in the buyout totalled $6,889,000. The terms of Morse's obligation under these notes are set forth above.

b. *Debt Service*

32. The buyout saddled Morse with significant debt that the Divisions had not had to contend with: the G & W notes, the Barclays loan, and the Undertaking. The amounts and terms of these obligations are set forth above. The payment obligations were in some respects flexible and in others uncertain.

a. The Purchase Price Promissory Note that Morse gave to G & W required annual payments of interest at 10 per cent per annum, except that interest that accrued in the first two years after the buyout would not be payable until the second anniversary of the buyout, August 24, 1986. However, Morse could elect at that time to add the accrued interest—a total of $1,343,400—to the principal balance and to pay it off, with

interest, on the schedule required for payment of principal.

b. The Undertaking, a contingent liability, would have to be paid only if Morse were unable to satisfy the relevant pension funding obligations. If Morse did default on the obligations, the Undertaking would require payment on August 24, 1989, of a total of $3,150,000, consisting of principal of $2,100,000 and interest of $1,050,000.

c. The Barclays loan was payable on demand, so Morse's payment obligations were in many respects subject to Barclays' discretion. The lending formula on this revolving loan provided for total advances, at Barclays discretion, of up to $5,000,000 at any given time. Barclays could demand payment of any such advances at any time, and it required regular payment of interest on outstanding advances at prime plus 3.5%. (At the time of the loan, this came to an annual rate of 16.5%. (Ex. 115, p. 9)) The actual amount of interest payments for any year would depend on the amount advanced during that year and fluctuations in the prime rate; but for purposes of projections, Lambert and Barclays expected that interest payments to Barclays in the first year after the buyout would total $684,000, which I find to have been a realistic figure for each of the three years of the loan agreement.

The loan agreement had a duration of three years and would be extended thereafter from year to year unless and until either Barclays or Morse decided to terminate it. Therefore, at the third anniversary of the buyout, Morse had to be prepared either to pay the balance of the Barclays obligation in full, to obtain an extension of the loan agreement, or to obtain replacement financing for the unpaid balance and for any additional working capital it would then need. If at that time all were going well, Morse would have little trouble obtaining either replacement financing or an extension of the Barclays loan. If Morse were doing poorly, however, neither an extension nor replacement financing would be easy to arrange, especially if G & W were not willing to subordinate its security interest in accounts receivables and inventory to that of a prospective replacement lender. In short, by the third anniversary of the buyout, Morse would have to be performing at least well enough to attract replacement (or continuing) financing.

33. These obligations subjected Morse to the following schedule of payments, which is based on the best-case assumptions that (a) Morse would elect to pay the initial G & W interest payment over time; (b) Morse would not become liable for the Undertaking obligation; and (c) on the fourth anniversary of the buyout, Morse would obtain replacement financing, of indefinite duration, for the full $4,000,000 principal balance of the Barclays loan at an annual cost of only $600,000 per year.[27]

| FY | G & W Int. | G & W Prin. | Barclays | Total |
|---|---|---|---|---|
| 1985 | $0 | $0 | $684,000 | $684,000 |
| 1986 | $0 | 892,040 | 684,000 | 1,576,040 |
| 1987 | $725,436 | 892,040 | 684,000 | 2,301,476 |
| 1988 | 644,832 | 806,040 | 600,000 | 2,050,872 |
| 1989 | 564,228 | 806,040 | 600,000 | 1,970,268 |
| 1990 | 483,624 | 806,040 | 600,000 | 1,889,664 |
| 1991 | 403,020 | 4,030,200 | 600,000 | 5,033,220 |
| Totals | $2,821,140 | $8,232,400 | $4,452,000 | $15,505,540 |

27. Most payments to Barclays and G & W are due on August 24 or November 24, 24 days and 116 days respectively after the close of the fiscal year. For ease of presentation, I am treating such payments in this schedule as if they were payable on the last day of the preceding fiscal year. Thus, an interest payment due on August 24, 1986, and a payment of principal due on November 24, 1986, will both appear as being due in FY 1986, even though that fiscal year ended on July 31, 1986.

If Morse did become liable for the Undertaking obligation, the FY 1989 total would increase by $3,150,000. And if Morse were forced to pay the Barclays debt in August, 1987, and were unable to obtain replacement financing, the FY 1987 total would increase by at least $4,000,000 (and perhaps as much as $5,000,000) and the total for each subsequent year would decrease by $600,000.

| Current Assets: | Cash | $75,000 |
|---|---|---|
| | A/R | 2,946,000 |
| | Inventory | 9,626,000 |
| | Prepaid Ex. | 11,000 |
| | | $12,658,000 |
| Current Liabilities: | Ass'd Liab. | $2,558,000 |
| | Barclays | 3,821,000 |
| | | $6,379,000 |
| Working Capital: | C/A | $12,658,000 |
| | C/L | (6,379,000) |
| | | $6,279,000 |

34. At the time of the buyout, the Divisions were barely breaking even. In order for Morse to break even, its operating profits would have to exceed those needed by the Divisions to break even by the total amount of debt payments that Morse had to pay in a given fiscal year. Moreover, if Morse had any profits after payment of debt service, such profits would be subject to income taxes—according to the Projected Statement of Income provided by Price Waterhouse, taxes would consume 46% of before-tax income (Ex. 94, p. 4)—which of course would impair Morse's ability to save money from year to year.

c. *Cash–Flow*

35. Morse secured the Barclays loan, the G & W Notes, and the Undertaking by giving Barclays and G & W security interests in virtually all its assets. This meant that Morse had no assets left to borrow against, so the likelihood of its being able to borrow additional funds was slim at best.

36. Working capital is the amount by which current assets exceed current liabilities. At the time of the buyout, Morse had working capital of $6,279,000, and the ratio of its current assets to its current liabilities was approximately 2:1. (Tr. 10/23/91, pp. 53–55; Tr. 11/16/90, pp. 57–59) Thus:

37. In this calculation, the Barclays debt is treated as a current liability because it was payable on demand. But the Barclays debt was a revolving loan, which differs from a term loan. As the Trustee's expert explained, revolving loans usually contemplate ongoing relationships. Most companies cannot pay the amount due on revolving loans when the lender demands payment without either obtaining replacement financing or liquidating. If Barclays demanded payment on its loan, Morse would have either to obtain replacement financing or to liquidate. Therefore, the Barclays revolving loan (or a replacement of it) was, in this sense, a permanent fixture on Morse's balance sheet. Morse had only to be able to pay the interest on it and, if necessary, to obtain replacement financing. (Tr. 11/16/90, pp. 60–62) Therefore, by counting the Barclays obligation as a current liability, the above calculations tend to understate both working capital and the ratio of current assets to current liabilities.

If working capital is recalculated by omitting the principal amount of the Barclays obligation and substituting in its place the annual interest charge on it, $684,000, working capital amounts to $9,416,000, and the ratio of current assets to current liabilities is 3.9:1.

38. In the four fiscal years before the buyout, Morse's working capital figures were as follows:

| FY | Current Assets | Current Liabilities | Working Capital | Ratio | Cash Profits |
|---|---|---|---|---|---|
| 1981 | $15,694,000 | $3,288,000 | $12,406,000 | 4.8:1 | $2,922,000 |
| 1982 | 12,346,000 | 3,117,000 | 9,229,000 | 4:1 | 29,000 |
| 1983 | 10,214,000 | 3,156,000 | 7,058,000 | 3.2:1 | (3,186,000) |
| 1984 | 13,405,000 | 4,245,000 | 9,160,000 | 3.2:1 | (578,000) |

(Barclays' Prospect Report, Ex. 99, p. 15)

39. The ratio of current assets to current liabilities is a rough measure of a debtor's ability to pay its current liabilities. To be able to pay its current liabilities, a debtor needs a ratio of at least 1:1, but the ratio must be somewhat higher to afford sufficient breathing room. In view of the Divisions' historical ratios and their cash profit/loss record for fiscal years 1981 through 1984, a ratio of only 2:1 at the time of the buyout would have been grossly inadequate. Even the ratio of 3.9:1 was slightly lower than was necessary to meet Morse's cash needs at the annual sales volume that Lambert was projecting for the first year after the buyout. In FY 1982, when the Divisions had annual sales of $32,323,000, a working capital ratio of 4.1:1, and a net loss of $1,008,000, they had a cash profit of only $29,000. This suggests that, at the annual sales level of $30,400,000 that Lambert was anticipating in the first year after the buyout, a ratio of 4.1:1 might suffice but would provide no margin for error.

d. *New Management: Plans and Projections*

40. James Lambert negotiated Morse's acquisition of the Divisions and, in the buyout transactions, became Morse's sole shareholder and the sole member of its board of directors. He had expertise in business turnarounds and had been somewhat successful in starting the turnaround of another Division of G & W, known as O & S Bearing, that he and a partner had acquired. (White Dep., p. 22) His strengths were in the areas of marketing and manufacturing. He was not as competent or experienced in the area of finance as he was in manufacturing and marketing—one Barclays official noted that "Lambert seems to lack financial ability" (Gagnon Dep., pp. 31–36)—but he was not incompetent in finance. And in handling the financial aspects of the buyout, such as reviewing financial statements and preparing projections, he had the help of Dennis Lemkau, who worked for Lambert at O & S and was, as the Trustee's own expert testified, "reasonably able" in finance. (Tr. 11/16/90, p. 118)

41. Lambert understood before the buyout that it would succeed only if he took steps to make the company more profitable, especially cost-saving measures, *and* the market improved. (Tr. 10/23/91, p. 70) Neither alone would suffice.

42. Lambert could not control the cutting-tools market or the economy in general. And Lambert himself conceded that the market for cutting tools in 1984 was flat. But the economy as a whole was on an upswing (Tr. 11/16/90, pp. 29–32), and Morse could expect the market for its products to improve as the economy itself did. (Tr. 10/23/91, pp. 143–144) Still, the debt incurred in the buyout had to be paid within seven years, so, given Morse's slim margins and its propensity to lose money in recessionary times, Lambert would need the market's cooperation for the full seven-year period. Since the long-term economic forecast was considerably less predictable than the short-term, Lambert was counting on luck.

43. Lambert did believe he could improve on the Divisions' narrow margins and make Morse sufficiently profitable to pay its debts as they came due through the seven years after the buyout. His strategy included a price increase on Morse's inventory, sales growth, substantial cost-saving measures, and "stretching the trade."

a. Price Increase: While investigating the feasibility of the buyout, Lambert learned from the Divisions' managers that they were planning to implement a five-percent, across-the-board price increase on the Divisions' inventory in May, 1984. The Divisions never implemented the price increase because they decided the market would not bear it: none of their competitors were raising prices at that time. (Lambert Dep., 5/17/88, p. 177; Lambert Dep., 8/9/88, pp. 28–29) But apparently no one told Lambert. Lambert based all his projections on the assumption that the increase had gone through; only after the

acquisition did he learn that it had not. (Lambert Dep., 8/9/88, pp. 31–32)

This error caused Lambert to overestimate net sales by five percent. Moreover, a price increase causes revenues to increase without a corresponding increase in cost of goods sold or in selling and administrative expenses. Therefore, in Lambert's projections, the price increase resulted in a dollar-for-dollar increase in before-tax income and, although blunted somewhat by income taxes, a significant increase in after-tax earnings. Without the price increase, and all other things being equal, Lambert's projections for FY 1985 through FY 1989 would have been altered as follows [28]:

| FY | Net Sales | Error | Estimated Net Earnings | Corrected Net Earnings |
|----|-----------|-------|------------------------|------------------------|
| 1985 | $30,400,000 | $1,448,000 | $ 634,000 | ($278,000) |
| 1986 | 33,000,000 | 1,571,429 | 842,000 | (12,429) |
| 1987 | 36,000,000 | 1,714,286 | 1,455,000 | 529,586 |
| 1988 | 39,000,000 | 1,857,143 | 2,130,000 | 1,127,443 |
| 1989 | 40,000,000 | 1,904,762 | 2,321,000 | 1,292,349 |
| Totals | | $8,495,620 | $7,382,000 | $2,658,949 |

In short, the error caused Lambert to overestimate net earnings by $1,766,000 in the two years immediately after the buyout, and by $4,723,000 in the five years after the buyout.

b. Sales Growth: As the table in the above paragraph shows, Lambert anticipated that net sales would grow from $26,400,000 in FY 1984 to $40,000,000 in FY 1989. Part of this increase was due to the nonexistent price increase. After the 1989 figure is reduced by the amount of the pricing error, it becomes clear that he expected to increase sales volume gradually to only $38,000,000. In view of Lambert's expertise in sales and the Divisions' historical sales record, I conclude that Lambert's anticipated increase in sales was realistic and achievable, but only if the economy continued to grow.

c. Cost–Saving Measures: Lambert expected to trim overhead and widen Morse's narrow margins with cost-saving measures that he expected would save approximately $1,600,000 per year. (Ex. 115, pp. 8–9; Lambert Dep. Exs. 1–A, 18, 19, 20) Some were measures that the Divisions conceived and passed on to Lambert, and others Lambert himself developed. All were to be implemented only after the buyout, so their feasibility was uncertain. Some measures were sure bets, including a proposed $417,000 reduction in the salaried work force. Others, including savings of $359,000 expected from an incentive program targeted at union employees, were far less likely—in this instance because the program required union approval that Lambert had not yet sought.

Lambert assumed in his projections that these measures would be fully implemented. This was overly optimistic because many of the measures were either untested or contingent on factors Lambert did not control. In evaluating the viability of Lambert's projections, Barclays officials discounted Lambert's expected savings by sixty percent. (Gagnon Dep. Ex. 6) I conclude that it was unrealistic for Lambert to count on achieving more than fifty percent of his planned savings. Therefore, his projected earnings before taxes should have been further reduced by approximately

**28.** Figures for net sales and estimated net earnings for FY 1985 are taken from Ex. 94, p. 4, and for FY 1986 through FY 1989, from Lambert Dep., Ex. 2, Five–Year Income Statement. Corrected net earnings have been calculated by subtracting the amount of the error from Lambert's anticipated earnings before taxes, and by reducing the difference (unless it is a loss) by 46% to account for income taxes. Figures for Earnings Before Taxes are taken from the same documents.

$800,000 per year. If one starts with the figures in the table in subparagraph (a) above, further reduction of earnings by this $800,000 per year would result in projected losses in the two years immediately after the buyout of $1,078,000 and $812,-429. And net earnings in the years thereafter would be reduced by $432,000 per year.

d. Stretching The Trade: Lambert planned to augment Morse's cash flow in the months immediately after the buyout by "stretching the trade": paying trade creditors more slowly than had been the Divisions' practice. (Barclays withheld credit from Morse in the first 45 days after the buyout to encourage Lambert to do this.) Lambert intended, before the buyout, not only to take full advantage of the credit terms offered by the trade creditors—most creditors required full payment within 30 days of invoicing—but also to take advantage of the creditors by paying more slowly than they required. At the time of the buyout, Morse had accounts payable of approximately $900,000. Therefore, if Morse stretched all its creditors by a full 30 days, it would increase the amount of cash available by $900,000.

44. Lambert assumed and planned that Morse would satisfy the pension funding obligations specified in the Undertaking and thus would avoid liability for the contingent liability specified therein, which would require payment on the fifth anniversary of the buyout of $3.15 million (consisting of principal of $2.1 million and interest of $1.05 million). For the reasons set forth in Appendix B, the Court finds that this was a reasonable assumption.

45. Lambert planned and assumed that Morse would be able to repay the Barclays loan by the fifth anniversary of the buyout without obtaining replacement financing. (Lambert Dep., Ex. 2, Cash Flow Projections) However, the Barclays loan agreement had a term of only three years; if replacement financing were not available and Barclays were unwilling to extend the loan, Morse would have to repay the loan on its third anniversary.

*Prospects for Success*

46. Having reviewed the Divisions' historical performance, the changes effectuated by the buyout, and Lambert's plans to improve Morse's profitability, the Court can now make conclusions about Morse's overall prospects for success after the buyout. My focus here is on determining whether Morse's capital structure and earning capacity at the time of the buyout were adequate to enable it to pay its debts as they matured, through the seven-year term of the G & W note, under a reasonable range of likely business conditions.

47. I start with Lambert's projections. Under Lambert's projections, Morse's sales and net earnings over the seven years would enable it to repay the Barclays debt in five years, repay the G & W debt in seven, and leave a balance of retained earnings of $1,202,000. (Lambert Dep., Ex. 2) The following table shows Lambert's projected earnings [29] for each of the seven years and the schedule on which Lambert expected to repay the Barclays and G & W debts. (All figures are in thousands.)

| FY | Retained Earnings | Current Earnings | Barclays | G&W | Balance |
|----|----|----|----|----|----|
| 1985 | $ 0 | $ 686 | $ 0 | $ 0 | $ 686 |
| 1986 | 686 | 842 | 686 | 194 | 648 |
| 1987 | 648 | 1,455 | 842 | 907 | 354 |
| 1988 | 354 | 2,130 | 1,455 | 741 | 288 |
| 1989 | 288 | 2,321 | 1,002 | 740 | 867 |
| 1990 | 867 | 2,321 | 0 | 740 | 2,448 |
| 1991 | 2,448 | 2,321 | 0 | 3,567 | 1,202 |
| Totals | | $12,076 | $3,985 | $6,889 | |

**29.** Although the G & W debt was payable over seven years, Lambert prepared projections for only the first five. Since his projections show Morse's performance peaking and leveling off in the fifth year, I am assuming that Morse's performance and net earnings in the sixth and seventh years would mirror those in the fifth.

48. The net balance of $1,202,000 suggests that Lambert left little room for error. Moreover, the projections assume that Barclays would permit Morse to repay its debt in five years instead of three; if Barclays were to call the loan in three years, and if Morse were then unable to obtain replacement financing, Morse's net earnings at the end of the third year would fall approximately $2,000,000 short of the amount needed to pay the debt then due. Also, the projections assume no liability on the Undertaking, which would place an additional demand on the Morse in the fifth year of $2,100,000 plus interest; the projections show earnings would be inadequate to pay this contingent obligation if it were to come due. Still, if Morse were performing in accordance with these projections, the Undertaking would not come due, and Morse would be able to extend the Barclays obligation over five years (either by extending the Barclays obligation or obtaining replacement financing). Therefore, if one accepts the earning assumptions on which Lambert based his projections, one would conclude that Morse would be able to pay its debts as they came due.

49. The Court has found that Lambert's projections were based on seriously flawed assumptions: his misunderstanding as to the price increase and his overstatement of cost savings together resulted in overestimation of annual earnings before taxes of approximately $2,200,000. When the above table is modified to account for these errors, earnings drop dramatically such that Morse becomes unable to pay its debts as they come due. (All figures are in thousands.)

| FY | Retained Earnings | Current Earnings | Barclays | G&W | Balance |
|---|---|---|---|---|---|
| 1985 | $0 | ($1,078) | $0 | $ 0 | ($1,078) |
| 1986 | (1,078) | (812) | 686 | 194 | (2,770) |
| 1987 | (2,770) | 267 | 842 | 907 | (4,252) |
| 1988 | (4,252) | 942 | 1,455 | 741 | (5,506) |
| 1989 | (5,506) | 1,133 | 1,002 | 740 | (6,115) |
| 1990 | (6,115) | 1,133 | 0 | 740 | (5,722) |
| 1991 | (5,722) | 1,133 | 0 | 3,567 | (8,156) |
| Totals | | $2,718 | $3,985 | $6,889 | |

In this scenario, Morse would incur losses (even before payment of principal) in the first two years and earn profits in the next five but at a rate well below what it would need to pay its long-term debt as it came due. After seven years, its total earnings would fall $8,156,000 short of the amount needed to pay the $10,874,000 in debt; and this latter figure excludes the $2.1 million Undertaking liability. Moreover, with such poor earnings in the early years, Morse would likely have difficulty extending the Barclays loan beyond three years and obtaining replacement financing. In short, Lambert's own projections, modified only to correct for the phantom price increase and the overestimated cost-savings, show that the buyout left Morse grossly undercapitalized, utterly unable to pay its debts as they came due.

50. This is by no means a worst-case scenario. Lambert's projections were founded on the assumption that the economy would remain healthy for at least seven years. Although he was likely to have the cooperation of the economy for at least two years, maybe even four or five, it was unrealistic to assume that the economy would not suffer at least a modest downturn for at least two of Morse's first seven years. A company has to be able to survive normal fluctuations in the business cycle. Morse could not. Other things could go wrong, too. For example, it was

possible that the renegotiation of collective bargaining agreements scheduled for FY 1985 would lead to an increase in labor costs or a strike. Either would have been a critical set back.

51. On the other hand, neither is the scenario outlined in paragraph 49 above a best-case scenario. Various contingencies could have resolved themselves in Morse's favor. It was conceivable that

(a) market conditions would improve such that the five-percent price increase that could not be implemented in 1984 could be implemented in 1985 or 1986 or that a smaller price increase could be implemented instead;

(b) Lambert would fully implement the $1,600,000 in cost-saving measures he had planned, in part by obtaining wage and benefit concessions he had not counted on obtaining;

(c) sales would return to the $40,000,-000 level in only three years instead of the five that Lambert used in his projections;

(d) because of (a), (b), or (c) above, Morse's performance in the first three years would be sufficiently strong that, after three years, Morse would be able to refinance the Barclays loan at a considerably lower rate (especially if the prime rate were to drop) and not have to pay off its revolving loan until some time after the G & W notes were paid; and

(e) Lambert might convince outside investors to invest in Morse, which might provide needed working capital at critical junctures.

52. None of these possibilities was probable:

a. Price Increase: Morse would likely implement a price increase sometime during the seven years after the buyout, but probably not in the first two years. Lambert described the market as flat; Chellis said it was soft. And given the tight competition in the industry, an increase would likely only keep pace with cost increases, affording Morse only a small net gain.

b. Cost Savings: Lambert was unlikely to obtain wage and benefit concessions from the unions. The New Bedford union had refused concessions twice in the previous three years, the first time after a lengthy strike, and had not obtained a wage increase in its last collective bargaining agreement. Morse was as likely to have to raise the wages of its hourly employees as it was to obtain concessions. On the whole, Lambert should realistically have counted on achieving only half of his projected savings.

c. Sales Increase: It was possible but not likely that sales would rebound faster and to greater heights than Lambert had projected. Lambert expected that sales would grow from $26.4 million in FY 1984 to $39 million in FY 1988 and $40 million in FY 1989. When the latter figure is reduced by the amount of the five percent price increase, it becomes clear that, in terms of 1984 prices, he projected sales growth to $38.1 over five years. In this respect, Lambert's projections were reasonable. Sales had grown by only $2.1 million from FY 1983 to FY 1984.

53. The Court concludes that the corrected projections outlined in paragraph 49 above show the most likely course of events after the buyout. Morse might have performed somewhat better than in that scenario, but not enough so to make a significant difference. Therefore, the Court concludes that, at the time of the buyout, Morse lacked the capital and earning capacity necessary to carry on its business and to pay its debts as they came due through the seven-year term of the G & W note under a reasonable range of likely business conditions.

Given its tight margins and relatively small ratio of current assets to current liabilities, Morse could not afford to suffer losses in the first years after the buyout. But, as the corrected projections in paragraph 49 above show, Morse was almost certain to suffer significant losses in that time. Morse was likely to continue in business for two years after the buyout, but only because (1) it could stretch its trade debt and (2), except for the relatively small payments due on the Slow–Moving Inventory Promissory Note, principal and interest

payments to G & W did not commence until the second anniversary of the buyout.

When the first payments to G & W became due, however, Morse would have either to default on the payments or to fund them by cutting critically into its already small working capital. This would almost certainly trigger a bankruptcy filing, though, depending on the state of the economy and G & W's willingness to forebear for a time, Morse might be able to limp along through the third or fourth year after the buyout. Morse would likely be unable to extend or obtain replacement financing for the Barclays loan. Morse would be unable to survive the fifth anniversary of the buyout—if it got that far—without either G & W's forbearance or a bankruptcy reorganization.

In summary, the Court concludes that Morse was likely to continue in business for two years after the buyout, but would almost certainly meet its demise—or at least find itself in a bankruptcy reorganization proceeding—between the second and fifth anniversaries of the buyout, probably closer to the second than the fifth. Morse had a slim chance of paying off its debt to G & W as it came due without having to liquidate, but that would require a strong economy and market growth for the full seven years, immediate implementation of a five percent price increase that was not feasible, immediate implementation of twice the cost savings that Lambert could count on achieving, and avoidance of liability on the Undertaking, all of which would produce only a small margin of success.

*The Denouement*

54. After the buyout, Morse operated at a loss for two years and finally sought protection under Chapter 11 of the Bankruptcy Code in January, 1987. Morse's profit and loss statements for these years show the following figures: [30]

| FY | Net Sales | Gross Margin | Percent | Net Earnings |
|----|-----------|--------------|---------|--------------|
| 1985 | $25,463,000 | $2,849,000 | 11.2% | ($666,000) |
| 1986 | 26,568,000 | 2,734,000 | 10.3 | (1,166,000) |
| 1987 | 16,060,000 | 116,000 | 0.7 | (2,921,000) |

(Ex. 41)

55. In the twelve months after the buyout, sales totalled $29,438,000; when increased by five percent to account for the price increase Lambert counted on, this yields just over the $30.4 million in sales that Lambert projected for FY 1985. But after the first year, sales dropped again to their FY 1984 level and never recovered. Lambert never implemented a price increase.

56. The record does not indicate which of Lambert's cost-saving measures were implemented and which were not.[31] It does indicate that Lambert improved upon the Divisions' gross margins. In fiscal years 1985 and 1986, Morse had gross margins of 11.2 and 10.3 percent, up substantially from the 5.9% margin in 1984, and even from the 9.5% margin obtained in 1982 on sales of $32.3 million. As this latter comparison shows, the higher margins resulted from cost reductions and not just from higher sales.

57. Except for approximately $500,000 owed to one of the pension funds, Morse paid all of the $2,557,816.22 in assumed liabilities that it incurred in the buyout.

**30.** FY 1985 includes only the ten months from the buyout through July 31, 1985. FY 1987 includes only nine months of actual operations: August, 1986, to April, 1987. Also, the figures in this table show the combined performance of Morse and its Hornet and Morse International affiliates.

**31.** It does indicate that Morse's 1985 renegotiation of the collective bargaining agreement with the New Bedford union resulted in a wage increase. (Tr. 6/1/90, pp. 28–29) Later, in mid-1986, Morse succeeded in obtaining union concessions of approximately $1 million per year, but this was too little too late.

(Lambert Dep., 5/17/88, pp. 105–107) Morse paid the first of two equal installments on the $1,061,594.00 assumed pension obligation on schedule in May, 1985, but defaulted on the balance a year later.

58. Within three months of the buyout, Lambert more than doubled Morse's trade payables: from $913,000 at the buyout to $2,033,000 in October, 1984. They reached $3,192,000 in May, 1985, dipped to approximately $2.7 million for a few months, then reached $3,620,000 in January, 1986, and thereafter remained in the vicinity of $3.5 million. (Ex. 41) Some of the initial increase was the result of a planned inventory build-up, which required increased steel purchases, but most of the increase was caused by Lambert's plan to stretch the trade.

In February, 1985, one Barclays auditor noted: "The client appears to be successful in extending the trade payables thirty days beyond due dates without any consequences." (Broderick Dep., Ex. 12A, p. 14) Approximately sixty percent of all trade payables were then more than thirty days overdue. *Id.* By November 30, 1985, payables were stretched past ninety days. (Broderick Dep., Ex. 12D, p. 14A) Within a few months of the buyout, this gross stretching of trade debt, which Lambert initially implemented to provide a short-term increase in cash, became a permanent fixture, one from which Morse never had the cash to extricate itself.

59. From the closing through the date on which Morse filed its bankruptcy petition, Morse paid only $86,000 to G & W and its assigns on the Slow–Moving Inventory Promissory Note, and it paid nothing on the Purchase Price Promissory Note. (Stip. ¶ 29) When the initial principal and interest payments came due on the latter note in 1986, Morse defaulted on them.

60. Morse was able to borrow substantially more cash after the buyout than it had reason to expect. In February, 1986,

Barclays began lending sums to Morse above the $5 million cap in the loan agreement; advances reached almost $6.0 million and averaged approximately $5.5 million in the thirteen months that commenced in February, 1986. In August or September, 1986, Morse was also able to obtain a $1.5 million loan from the Economic Stabilization Trust of the Commonwealth of Massachusetts.[32] Morse also obtained credit in less orthodox ways: by stretching the trade, Morse effectively borrowed approximately $2 million at no cost. And Morse's failure to pay the amounts due to G & W and to the pension fund in 1986 also increased its cash.

61. But Morse failed to make these payments—to trade creditors, G & W, and the pension fund—because it lacked the cash to make them. And it lacked the cash because it operated at a loss from the very start. Morse did not fail because of cash-flow problems. It had such problems because, more fundamentally, it lacked the capital and the earning capacity to turn a profit while carrying the debt it incurred in the buyout.

62. Barclays contends that Morse's demise was caused after the buyout by Lambert's imprudent decisions to build up inventory and to invest Morse's cash in two affiliates, all of which drained Morse of working capital when it could ill afford it. The Trustee disagrees, arguing that these had only minor effects. The Court finds that although Lambert's decisions materially affected Morse's performance, they merely hastened Morse's collapse. They were not its fundamental cause.

a. Affiliates: In January, 1985, Lambert expanded Morse's operations by acquiring Hornet Industries, Inc. ("Hornet"), as a wholly owned subsidiary of Morse, and by creating Morse International ("International"), first as a division of Morse and then as separately incorporated affiliate.[33]

32. Morse was able to obtain this loan because G & W agreed to subordinate its first position security interest in some of G & W's collateral to the security interest that Morse gave to the Economic Stabilization Trust. (Broderick Dep., 8/11/88, p. 53)

33. In July, 1985, Lambert reorganized Morse and its affiliates: Morse, Hornet, and International became wholly-owned subsidiaries of a new corporation, LCI, Inc. Later in 1985, LCI itself was acquired by and became a subsidiary of Belairre Energy, Inc., a publicly held corpo-

Hornet was a manufacturer of special cutting tools whose operations Lambert believed would complement Morse's. (Lambert Dep., 5/17/88, pp. 80–81, 153; Ex. 41, 1985 Cash Flow Statement) And International was created to acquire and sell foreign-manufactured cutting tools in the United States. Lambert believed the foreign inventory would enable Morse to compete in new markets. (Lambert Dep., 5/17/88, pp. 81–82)

Morse acquired Hornet with an investment of only $150,000, and it created International with investments of approximately $747,000. (Lambert Dep., 5/17/88, p. 153) By July 31, 1985, Morse's investments [34] in these affiliates totalled $1,684,000. (Tr. 12/14/89, pp. 114–116; Ex. 44) This amount grew steadily until Morse filed for bankruptcy protection in January, 1987. At that time, Morse had intercompany receivables of $6,343,000, but also had intercompany payables of $2,583,000, yielding net intercompany receivables of $3,760,000. (Tr. 12/14/89, pp. 128–133; Ex. 41, 1987 Balance Sheet, Morse Cutting Tools Division)

As of June 16, 1987, International owed Morse $8,946,312.34, and Morse owed International $4,673,861.33 for loans made by International to Morse, yielding a net debt to Morse of $4,272,000. (Exs. 81 and 84) Not all of this was for cash advances. Approximately $3,000,000 of the gross amount that International owed to Morse was compensation for Morse's assumption of International's $3,000,000 obligation to Motors Trading Corporation (for purchase of foreign inventory), payment on which did not come due until after both Morse and International had discontinued operations. (Exs. 81 and 84) It increased Morse's liabilities and International's inventory, but never had a chance to deplete Morse's cash.

In sum, the Court concludes that Morse's investments in its affiliates constituted a net cash drain of only $1,422,000, consisting of $1,272,000 to International and $150,000 to Hornet, the principal effect of which was felt in the first half of 1986. The evidence on this subject is thin and unclear, so it is possible that the affiliates constituted more of a drain on Morse than this figure indicates, but I cannot find by a preponderance of the evidence that the amount was higher than this.

The affiliates did not generate profits, but neither were they the principal source of the operating losses that dragged Morse down. In FY 1985, when Morse lost $462,000, the affiliates together lost $278,953. (Ex. 112) In FY 1986, when Morse lost $1,183,000, the affiliates posted combined profits of $17,000. (Ex. 41) And in the first six months of FY 1987, when Morse lost $1,697,000, the affiliates together lost only $248,000. (Ex. 41) Overall, Morse lost $3,342,000, and the affiliates lost $509,953.

Between their losses and the investments they required, the affiliates took a toll on Morse, but they brought at least one benefit, too. The acquisition of these entities increased Morse's collateral base and thereby permitted Morse to increase its borrowing limit under the Barclays loan in FY 1986. (Broderick Dep., Ex. 4N) This mitigated Morse's loss of liquidity by $1,000,000. The net drain on Morse's resources was thus less than $1,000,000.

This was enough to make a difference, but not a large one. Morse began losing money before it invested in the affiliates and continued to do so afterwards in amounts far in excess of the affiliates' losses. Also, by January, 1987, Morse was stretching the trade well beyond appropriate limits by over $2,000,000, and it had defaulted on obligations to G & W and the pension fund totalling approximately $2,000,000 more. In addition, it had obtained the unanticipated benefit of the $1.5 million loan from the Economic Stabiliza-

---

ration. After the acquisition, Belairre changed its name to Lambert Consolidated Industries, Inc., and Lambert owned a majority of its stock. The Court has no evidence that either the reorganization or the acquisition of LCI by Belairre infused new capital into Morse.

**34.** The investments took the form not of equity but of loans; they appeared on Morse's balance sheet as "Intercompany Accounts/Notes Receivable."

tion Trust. In view of these circumstances, the Court concludes that Morse's investments in Hornet and International only hastened Morse's demise by a few months, a year at most. This was not a case of a strategic error precipitating the fall of an otherwise promising enterprise.

b. Inventory Build–Up: Barclays contends also that Morse's failure was caused by Lambert's decision to increase inventory levels in the year after the buyout, a move that critically reduced Morse's liquidity. There is little support for this theory.

Morse increased its own inventory level from $9.6 million at the time of the buyout to $10.4 million on July 31, 1985; and it supplemented this with the inventories of both International and Hornet, whose values (on July 31, 1985) were $3,687,000 and $82,000 respectively, for a total increase of $4,569,000. (Ex. 112, Consolidating Balance Sheet) But $3,000,000 of this increase consisted of the foreign inventory acquired by International from Motors Trading Corporation, for which no cash was ever paid. Therefore, the net cost in cash of the increase was only $1,569,000, and only half of this was attributable to Morse's own inventory. The actual cost of the build-up was thus relatively small.

Moreover, the Court has no evidence that the build-up actually hurt Morse. It is entirely possible that, as Lambert hoped and planned, the build-up enabled Morse to achieve sales significantly in excess of what it would have otherwise have been able to achieve. That is, the increased inventory may have mitigated losses, not aggravated them. The Court therefore rejects as unsupported Barclays' argument that Lambert's decision to build-up inventory contributed significantly to Morse's failure.

RULINGS OF LAW

 a. *Fraudulent Conveyance Counts: General Rulings*

1. The Trustee's fraudulent conveyance claims are governed by the law of the Commonwealth of Massachusetts. See

*David Ferrari, Trustee v. Barclays Business Credit*, 108 B.R. 384 (Bankr.D.Mass. 1989).

2. Massachusetts has adopted the Uniform Fraudulent Conveyance Act ("UFCA"), G.L. c. 109A, which is to be "interpreted and construed to effectuate its general purpose to make uniform the law of those states which [have enacted] it." G.L. c. 109A, § 12. Where Massachusetts law is silent, the Court may look to the law of other jurisdictions that have adopted the UFCA, *Moody v. Security Pacific Business Credit*, 971 F.2d 1056, 1063 (3rd Cir. 1992), and to decisions construing analogous provisions of the Bankruptcy Code. *Id.*, citing *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1298–1299 (3rd Cir.1986), *cert. denied sub nom McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

 b. *G.L. c. 109A, § 4*

3. In his first cause of action under the UFCA, the Trustee states that Barclays' claim should be annulled and its liens set aside under § 4 of the UFCA because Morse incurred its obligation on the Barclays loan [35] and conveyed liens to Barclays without fair consideration in a transaction that left Morse insolvent.

4. Section 4 of the UFCA states as follows:

 Every conveyance made and every obligation incurred by a person who is or thereby will be rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

G.L. c. 109A, § 4. The parties raise three issues under this section: (a) whether there exists a qualified unsecured creditor within the meaning of 11 U.S.C. § 544(b) such that the Trustee has standing to proceed under UFCA § 4; (b) whether Morse received adequate consideration for the obligation it

---

**35.** The Trustee does not seek to invalidate the Barclays loan in its entirety. He attacks only the $3,821,000 portion thereof (plus interest and charges associated therewith) advanced to fund the cash payment to G & W in the buyout.

incurred and the security interests it gave to Barclays; and (c) whether Morse, by incurring the obligation and granting liens to Barclays, was rendered insolvent. The Trustee bears the burden of proof on all three issues. *David Ferrari, Trustee v. Barclays Business Credit*, 108 B.R. 389, 391 (Bankr.D.Mass.1989) (Trustee bears burden of proving existence of qualified unsecured creditor.); *Ward v. Grant*, 9 Mass.App.Ct. 364, 367, 401 N.E.2d 160 (1980) (creditor bears burden of proving the conveyance fraudulent under UFCA § 4); *In re O'Day Corporation*, 126 B.R. 370, 390 (Bankr.D.Mass.1991) (under Massachusetts law, trustee bears the burden of proving insolvency). The cause of action is one for constructive, not actual, fraud, so the standard of proof is a preponderance of the evidence.

*Qualified Unsecured Creditors*

█ 5. The Trustee asserts his fraudulent conveyance claims pursuant to the authority granted him in § 544(b) of the Bankruptcy Code. It states:

The Trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowed only under section 502(e) of this title.

11 U.S.C. § 544(b). Therefore, in order to proceed under UFCA § 4, the Trustee must prove that there exists at least one qualified, unsecured creditor: a creditor holding an allowable unsecured claim who could bring the same avoidance action the Trustee seeks to bring. And, unlike UFCA §§ 5 and 7, which extend standing to "future creditors," UFCA § 4 limits standing to creditors whose claims against the debtor were in existence at the time the interest was transferred or the obligation incurred.

6. To prove the existence of qualified creditors, the Trustee relies on the claims filed in the Morse Tool bankruptcy case by creditors who acquired claims against G & W before the buyout that were assumed by Morse in the buyout. The Trustee identifies seven such creditors: Thomas O. Phillips, William R. King, Lawrence D. Green, Mary Lucille Burfiend, Hercules Tool Company, the United Electrical, Radio and Machine Workers of America and its Local 277 (collectively, "the Union"), and the Pension Benefit Guaranty Corporation ("PBGC").

7. Barclays disputes the validity of the Union and PBGC claims, but not of the other five. Each of the five has filed a proof of claim in the Morse Tool bankruptcy case. (Ex. 37) And each of their proofs of claim shows that the claim it documents arose, at least in part, before August 24, 1984. Pursuant to Rule 3001(f) of the Federal Rules of Bankruptcy Procedure, a proof of claim filed in accordance with the Rules is *prima facie* evidence of the validity and amount of the claim; and the Court has no evidence that the Trustee objected to any of these five claims. The Court therefore deems these five claims valid and allowed (for purposes of this proceeding).[36]

█ 8. Despite the existence of these five unsecured claims, however, the Court rules that the Trustee lacks standing to proceed under UFCA § 4. The Court reaches this conclusion because, although each of the five claims arose before the buyout, none were claims against Morse until Morse assumed them in the buyout. Prior to the buyout, the obligor on each of these claims was G & W, which remained obligated on the claims (and solvent) after the buyout. As to Morse, these were not preexisting claims. Morse had no debts before the buyout; it could not have had any because it was created only at the buyout. Moreover, as to these claimants, the buyout transactions, including the Barclays loan, cannot have been fraudulent. The buyout did not weaken the obligor on these claims; rather, it gave the claimants a second obligor to look to for satisfaction of their claims. For these reasons, I conclude that creditors whose claims existed before the buyout but for which Morse

---

**36.** This renders moot the issues over the validity of the PBGC and Union claims; if such claims were deemed allowed, too, the Trustee would have no more standing than he has by virtue of the five that have been deemed allowed.

became liable only in the buyout lack standing under G.L. c. 109A, § 4, and, therefore, that the Trustee lacks authority to proceed under that section.

### Conclusion under UFCA § 4

9. The Court need not and does not address the issues of solvency and inadequacy of consideration. Having found that the Trustee has failed to prove the existence of a qualified unsecured creditor, the Court rules that judgment should enter for Barclays on the Trustee's count under § 4 of the UFCA.

### c. *G.L. c. 109A, § 5*

10. The Trustee also contends that Barclays' security interests should be set aside under § 5 of the UFCA because Morse conveyed the security interests to Barclays without fair consideration and, after the conveyance, was left with unreasonably small capital. UFCA § 5 states:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction, for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction, without regard to his actual intent.

G.L. c. 109A, § 5. Again, the Trustee bears the burden of proof, by a preponderance of the evidence, on the three principle issues: (a) whether there exists a qualified unsecured creditor within the meaning of 11 U.S.C. § 544(b) such that the Trustee has authority to proceed under UFCA § 5; (b) whether Morse received adequate consideration for the security interests it gave to Barclays; and (c) whether the Morse's remaining property after the buyout constituted unreasonably small capital.

11. Pursuant to a preliminary motion to determine whether there exist qualified unsecured creditors under 11 U.S.C. § 544(b) such that the Trustee has authority to proceed under G.L. c. 109A, §§ 4, 5, and 7, the Court ruled that there exist

qualified unsecured "future creditors," persons who became creditors during the continuance of Morse's business after the buyout, and, therefore, that the Trustee has authority under 11 U.S.C. § 544(b) to proceed under UFCA §§ 5 and 7. See *David Ferrari, Trustee v. Barclays Business Credit*, 108 B.R. 389 (Bankr.D.Mass.1989).

### Unreasonably Small Capital

12. The Trustee bears the burden of proving that, after the conveyance of security interests to Barclays, Morse's remaining property constituted "unreasonably small capital" for the business in which it was engaged. Neither the UFCA nor Massachusetts case law defines unreasonably small capital. This Court agrees with the opinion expressed recently by the Third Circuit Court of Appeals that unreasonably small capital denotes a level of capitalization that renders a debtor unable to generate sufficient profits, or at least cash flow, to sustain operations. *Moody v. Security Pacific Business Credit*, 971 F.2d at 1070. The focus is on whether the debtor's assets and earning capacity together give it the wherewithal to continue in business. Unreasonably small capital describes a condition short of equitable insolvency— the inability to pay obligations as they come due—because "an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they come due." *Id.; In re Vadnais Lumber Supply*, 100 B.R. 127, 137 (Bankr. D.Mass.1989) ("Unreasonably small capitalization therefore encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future."); *In re O'Day Corporation*, 126 B.R. at 407. The primary purpose of UFCA § 5 "is to 'prevent an undercapitalized company from being thrust into the market place to attract unwary creditors to inevitable loss.'" *Barrett v. Continental Illinois Nat. Bank & Trust*, 882 F.2d 1, 5 (1st Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990), quoting *Wells Fargo Bank v. Desert View Building Supplies*, 475 F.Supp. 693, 696 (D.Nev.1978), *aff'd*, 633 F.2d 225 (9th Cir.1980).

13. Whether a company was adequately capitalized is a decision that must be made on the basis of information and considerations available at the time of the buyout, not of hindsight.

> The test for unreasonably small capital is reasonable foreseeability.... The critical question is whether the parties' projections were reasonable.
>
> Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. *See Credit Managers Ass'n [v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1985)] at 184–186. However, reliance on historical data alone is not enough. To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin of error.

*Moody v. Security Pacific Business Credit,* 971 F.2d at 1073. Massachusetts law appears to take the same approach:

> The critical inquiry when considering whether a transfer or conveyance has left a company with an unreasonably small capital is, therefore, one that weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question.

*Barrett v. Continental Illinois Nat. Bank & Trust,* 882 F.2d 1, 4–5 (1st Cir.1989) (construing G.L. c. 109A, § 5).

The Court has conducted just such an inquiry in its findings of fact. The Court did not limit its inquiry to the time immediately after the buyout. "[Section 5 of the UFCA] requires a court to examine a company's capital throughout a reasonable period of time surrounding the precise date of a challenged transfer." *Id.* at 4. Where the transfer occurs as part of a buyout that placed significant long-term demands on the debtor, UFCA § 5 requires that the analysis take those demands into account. In Morse's case a reasonable inquiry must extend through the seven-year term of the G & W obligation, which placed large cash demands on Morse that were designed not to take effect immediately.

14. As is demonstrated in the Court's findings of fact, the buyout rendered Morse unable to continue in business. Lambert's projections were unreasonable and imprudent; this was discernable from information available before the buyout; and both Lambert and Barclays had reason to be skeptical and to inquire into the assumptions that rendered the projections so unreasonable. Even if the assumptions on which the projections were based had been sound, the projections themselves still provided only a small margin of error.

But the projections were not sound. They relied heavily on a price increase that never occurred, on cost-saving measures that were untested, and on sales and market performance that were significantly better than existed at the time of the buyout. They hardly demonstrated that Morse would be able to survive under a reasonable range of likely business conditions. They demonstrated just the opposite: that Morse, as capitalized after the buyout, could survive only under the most favorable and improbable of conditions. No one needed sophisticated projections to show that if conditions merely remained the same as they were at the time of the buyout—little growth in sales volume, no price increase, and minimal cost-savings—a scenario that certainly falls within the reasonable range of likely business conditions, Morse would soon be dead in the water.

Morse was able to stretch the trade payables, and payments on long-term debt did not commence until two years after the buyout, so there was a significant and predictable delay between the buyout and Morse's almost inevitable collapse. The fact that Morse was able to remain afloat for over two years after the buyout does not establish that the buyout left Morse adequately capitalized to continue in business. That Morse would fail was almost certain from the start. Events that transpired after the buyout may have hastened Morse's collapse, but they came after

Morse was already fatefully undercapitalized. The Court concludes that the buyout transactions left Morse with unreasonably small capital.

*Fair Consideration*

15. The Trustee also bears the burden of proving that the Morse incurred its obligation on the Barclays loan and conveyed liens to Barclays without fair consideration. In relevant part, the UFCA defines fair consideration as follows:

> Fair consideration is given for property or obligation—
>
> (a) when in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied.

G.L. c. 109A, § 3(a).

■ 16. In order to determine whether fair consideration was given, the Trustee would have the Court disregard the "spin-off"—in which G & W transferred the assets and liabilities of the Divisions to the newly created Morse Tool—and focus only on the sale of G & W's stock in Morse to MCT, Inc. Under this analysis, Morse would be deemed to have received nothing in exchange for the purchase price it paid to G & W other than ownership and control of its own stock. Under the case law, this would be viewed as a form of stock redemption that brought no economic benefit to the corporation. Therefore, as a matter of law, Morse would be deemed to have received no consideration for the purchase price it paid to G & W. And, since the proceeds of the Barclays loan went directly to G & W as the cash portion of the purchase price, Morse would be deemed to have received no consideration from Barclays. This is the "stock sale" view of the case.

17. The Trustee's proposed analysis, by focussing narrowly on only one of the buyout transactions, takes it out of context and ignores the economic reality of what actually occurred. The Court must look at the buyout transactions together as a whole, both to understand accurately what occurred and to reflect the intent of the parties to the buyout. The parties meant for the various transactions that comprised the buyout—the spin-off, the sale of all shares, the Barclays loan, and Morse's guarantees of MCT's obligations to G & W and Barclays—to occur together. No one of these would have been undertaken without the others. Therefore, the Court should collapse the various transactions and understand them as one integrated transaction.[37]

■ 18. Using this approach, the Court rejects the Trustee's "stock sale" theory and adopts Barclays' "asset sale" view of the buyout: in essence, the buyout was a purchase of assets and liabilities from G & W.[38] It was not a stock sale because Morse Tool had no separate corporate existence prior to the buyout. It consisted of two unincorporated divisions, which were assets of G & W. It is true that these assets were spun-off into a separate corporation before they were sold to MCT, but this amounted to mere packaging: the corporation was a package in which to convey the assets and liabilities and was used only to facilitate the sale. It had no more significance than that. The corporation did not transact business before the sale; had no creditors (other than on the obligations it assumed from G & W, on which G & W remained liable); and, but for the sale, would not have been created.

---

**37.** *United States v. Tabor Court Realty Corp.,* 803 F.2d at 1302–1303; *Moody v. Security Pacific Business Credit,* 127 B.R. 958, 992 (D.C.W.D.Pa. 1991), *aff'd,* 971 F.2d 1056 (3rd Cir.1992) ("We are convinced that we should 'collapse' the various steps in the … leveraged buyout and treat them as 'one integral transaction.'"); *In re Roco Corporation,* 21 B.R. 429, 436 (B.A.P. 1st Cir. 1982), *aff'd,* 701 F.2d 978 (1st Cir.1983) ("Substantial right and justice, rather than technical form, control."); *In re Vadnais Lumber Supply,* 100 B.R. at 136 ("In applying the test [for rea-

sonably equivalent value, contained in the Bankruptcy Code fraudulent conveyance section], we must examine all aspects of the transaction in order to measure carefully the value of all its benefits and burdens to the Debtor, direct or indirect."), citing *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 991–994 (2d Cir.1981).

**38.** The Court does not also adopt Barclays' further argument that an asset sale cannot be a fraudulent conveyance.

Morse did have a separate corporate existence before the sale to MCT, but only for a technical or metaphysical moment, not for any real time or business purpose of significance to creditors.

19. As the Trustee contends, the buyout depleted Morse's equity by saddling it with debt and encumbering its assets. However, it is also true that, but for the buyout, Morse would have been an empty shell of a corporation with no assets to encumber or deplete. And the assets Morse received in the buyout (less the liabilities it assumed) were its consideration. Morse received consideration in the buyout, not just control of its own stock.

20. Collapsing the spin-off, the sale of all shares, Morse's guarantees of MCT's obligations to G & W and Barclays, and the merger into one transaction, the buyout boils down to this: G & W sold the assets and liabilities that constituted the Divisions to Morse Tool, Inc., a new corporation created by James Lambert, for the purchase price of $10,710,000 (plus the contingent liability on the Undertaking). The

consideration for the purchase price was not stock but the collection of assets and liabilities that constituted the Divisions. Therefore, in order to determine whether Morse received fair consideration for the purchase price (and, implicitly, for the Barclays loan obligation), the Court must compare the purchase price to the net value of the assets and liabilities received in the buyout.

21. The purchase price, as finally adjusted, was $10,710,000, consisting of the following components:

| | |
|---|---:|
| Cash | $ 3,821,000 |
| Purchase Price Note | 6,717,000 |
| Slow–Moving Inventory Note | 172,000 |
| Undertaking | 0[39] |
| Total | $10,710,000 |

22. The parties agree that the consideration received for the purchase price is equal to the value of the assets received minus the amount of the liabilities assumed.

23. The parties disagree about the value of the assets received. They take the following positions:

| Assets | Trustee | Barclays |
|---|---:|---:|
| Accounts Receivable | 2,946,000 | 2,946,000 |
| Prepaid Expenses | 11,000 | 11,000 |
| Inventory | 3,412,000 | 9,626,000 |
| Land and Buildings | 934,000 | 983,000 |
| Machinery and Equipment | 4,906,000 | 6,133,000 |
| Total Assets | $12,209,000 | $19,699,000 |

24. Their disagreement over the value of the inventory is limited to the issue of whether the inventory should be valued at its going-concern value or at orderly liquidation value. The Trustee does not specifically address the standard of valuation to be applied when determining adequacy of consideration. Rather, he argues that for purposes of determining insolvency under UFCA § 4, the Court should use

orderly liquidation value because, after the buyout, Morse was not a financially viable entity. Then, without addressing whether the same standard of valuation should be used in calculating the adequacy of consideration, he uses the figures from his solvency analysis in arguing that consideration was inadequate. See Trustee's Proposed Findings of Fact and Rulings of Law, pp. 67–71, 89–91.

---

**39.** If the $2,100,000 contingent liability on the Undertaking were included in this sum, the total purchase price would be $12,810,000. But the Trustee has not sustained his burden of proving that Morse was certain or even likely to default *on its pension funding obligations, so the Court* has valued the Undertaking liability at zero. See Appendix B.

Barclays does the same: it argues that going-concern value should be used in the solvency analysis, and then assumes that the same figures and standard of valuation should govern the consideration analysis. Barclays also seems to argue that as long as the transaction was an asset sale in which some consideration was received, the amount of consideration received is irrelevant.

25. The amount of consideration received is relevant. "[The] value must pass a measurement test." *In re Vadnais Lumber Supply,* 100 B.R. at 136. The UFCA speaks of "fair consideration," which it defines as property conveyed as a "fair equivalent" and in "good faith." G.L. c. 109A, §§ 3(a), 4. This requires at least a reasonable equivalence between the purchase price and the value of the property received. *In re O'Day Corporation,* 126 B.R. at 393.

26. For the purpose of determining the adequacy of consideration, the Court rules that Morse's inventory should be valued at its going-concern value at the time of the buyout, not at liquidation value. "Where bankruptcy is not 'clearly imminent' on the date of the challenged conveyance, the weight of authority holds that assets should be valued on a going concern basis." *Moody v. Security Pacific Business Credit,* 971 F.2d at 1067, and cases cited.[40] At the time of the buyout, Morse was not on its death bed; bankruptcy was not clearly imminent. It was clear then that Morse would be able to continue in business for at least two years. With Morse's inventory turnover rate of 2.7, two years would be more than enough time for Morse to recover the cost of its inventory

in the ordinary course of business at least five times. Moreover, Morse was selling its inventory at above cost.

It is true, as the Trustee contends, that bankruptcy, though not imminent, was probable in the third year after the buyout, the year when payments became due on Morse's debt to G & W. Nonetheless, bankruptcy was not so imminent that Morse would be unable to recover the going concern value of the inventory. Therefore, the Trustee is wrong in arguing that orderly liquidation value was "pragmatically the maximum that could be gained" from the inventory. The Court therefore concludes that for adequacy of consideration purposes, the inventory should be valued at its going concern value, $9,626,000.

27. Barclays argues that the land and buildings should be valued at their fair market value at the time of the buyout, $983,000. The Trustee agrees that this was the fair market value, but argues that it should be reduced by five percent to reflect a reasonable sales commission. The Court concludes that, for purposes of determining the adequacy of consideration, no reduction should be made for the cost of sale. The inquiry is whether Morse paid a fair price, not what its net recovery would be upon resale. Fair market value is what a buyer would have to pay to acquire this property. Therefore, for the adequacy of consideration analysis, the real property should be valued at $983,000.

28. Barclays argues that the machinery and equipment should be valued at their fair market value at the time of the buyout, $6,133,000. The Trustee accepts this figure as the fair market value but argues that it should be reduced by twenty per-

---

**40.** This is the standard of valuation used for solvency analysis. Under the UFCA, the standard of valuation for adequacy of consideration purposes is not in all respects the same as for solvency purposes. The case law provides little guidance on their relation.

In determining the adequacy of consideration, the focus is on ascertaining whether the price paid was fair and reasonable or, on the other hand, was so high as to have been, at least in part, a gift or give-away. It asks whether, in fairness and good faith to creditors, the consideration paid can be deemed reasonable. Sol-

vency analysis, on the other hand, asks whether the assets' resale value would suffice to pay the probable liability on existing debts as they come due. G.L. c. 109A, § 2(1). The former asks what one would have to pay to acquire something, and the latter, what one would have left after selling it at its present fair saleable value. The latter would normally be lower than the former because (if for no other reason) it requires subtraction of selling costs. Therefore, there is no prejudice to the Trustee in using the solvency analysis standard for adequacy of consideration purposes.

cent: ten percent to account for the costs of sale and an additional ten percent because, in an orderly liquidation, the property would sell for at least that much less than fair market value. The Court rules that fair market value should control. There is no indication that Morse could have purchased these assets at liquidation prices, so liquidation value should not be used. And in determining the adequacy of the consideration, sale costs are irrelevant. Therefore, the Court concludes that for the adequacy of consideration analysis, the machinery and equipment should be valued at $6,133,000.[41]

29. On the basis of the above ruling, the Court rules that the assets acquired in the buyout had a total value of $19,699,000 as follows:

| Assets | Value |
| --- | --- |
| Accounts Receivable | 2,946,000 |
| Prepaid Expenses | 11,000 |
| Inventory | 9,626,000 |
| Land and Buildings | 983,000 |
| Machinery and Equipment | 6,133,000 |
| Total Assets | $19,699,000 |

30. The parties agree that Morse assumed obligations listed on Morse's balance sheet as "assumed liabilities" in the total amount of $2,558,000. They disagree over other liabilities that do not appear on the balance sheet, including Morse's obligations to provide retiree benefits, Morse's Undertaking liability, and Morse's liability to the PBGC under ERISA § 4062(b)(2). For the reasons set forth in Appendix A, the Court values Morse's obligation to provide retiree benefits at the time of the

buyout at $1,708,000. For the reasons set forth in Appendix B, the Court values Morse's liability to G & W on the Undertaking at zero.[42] And for purposes of determining the adequacy of consideration, the Court will assume for the sake of argument that Morse assumed liability to the PBGC in the full amount that the Trustee seeks, $2,383,000.[43] Therefore, the Court rules that the liabilities assumed in the buyout totalled no more than $6,649,000:

| Liabilities | Amount |
| --- | --- |
| Assumed Liabilities | $2,558,000 |
| Undertaking | 0 |
| Retiree Benefits | 1,708,000 |
| PBGC Claim | 2,383,000 |
| Total Liabilities | $6,649,000 |

31. Therefore, Morse received assets totalling $19,699,000, and assumed liabilities of no more than $6,649,000, bringing the net value of the consideration received to at least $13,050,000.

| | |
| --- | --- |
| Assets | $19,699,000 |
| Liabilities | (6,649,000) |
| Net Consideration | $13,050,000 |

This is more than adequate consideration for the purchase price of $10,710,000. It easily satisfies the tests of reasonable equivalence and good faith set forth in UFCA § 3(a). The Court concludes that Morse received fair consideration for the obligations it incurred and the security interests it gave in the buyout, including the obligation and security interests to Barclays.[44]

*Conclusion under UFCA § 5*

32. The Court finds that the Trustee has carried his burden of proving that

---

**41.** The in-place value of the machinery and equipment was $1,000,000 higher: $7,133,000. The property was purchased in place, so the in-place value would apply, but Barclays asks only that the lower figure be used.

**42.** In any case, the Undertaking liability is more properly classified as part of the purchase price, not as an assumed liability.

**43.** The Court need not determine what Morse's liability was on the alleged PBGC claim. Even if Morse were deemed to have assumed liability to the PBGC in the full amount that the Trustee alleges, $2,383,000, the Court would find that property received by Morse for the obligations incurred in the buyout was more than a fair consideration.

The Trustee argues that the PBGC claim totals $1,503,000, but he adds that if the Court finds that Morse's obligation for retiree benefits is less than the full amount he alleges, $4,641,000, then the PBGC claim should be increased by thirty percent of the difference. The Court has quantified the obligation to provide retiree benefits at $1,708,000. The difference between $4,641,000 and $1,708,000 is $2,933,000, thirty percent of which is $879,900. This would bring the total PBGC claim to $2,382,900 [$1,503,000 + 879,900 = $2,382,900].

**44.** This ruling is as valid with respect to the Trustee's cause of action under UFCA § 4 as to his cause of action under UFCA § 5 and represents a second basis under which his count under § 4 must be denied.

there exist qualified unsecured future creditors such that the Trustee has authority to proceed against Barclays under G.L. c. 109A, § 5, and that the buyout left Morse with unreasonably small capital. Nonetheless, he has failed to demonstrate that Morse's conveyance of security interests to Barclays was made without fair consideration. Therefore, the Court rules that judgment should enter for Barclays on the Trustee's count under § 5 of the UFCA.

### d. *G.L. c. 109A, § 7*

33. In his final fraudulent conveyance count, brought under UFCA § 7, the Trustee asserts that the Court should avoid Barclays' liens and Morse's obligation to Barclays because, in carrying out the buyout, Morse and Barclays acted with actual intent to delay and hinder Morse's creditors.

34. UFCA § 7 states:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors.

G.L. c. 109A, § 7. The Trustee bears the burden of proving actual intent by clear and convincing evidence. *In re O'Day Corporation*, 126 B.R. at 410, and cases cited. "Actual intent to defraud need not be shown by direct evidence, but rather may be inferred from the circumstances surrounding a conveyance." *Moody v. Security Pacific Business Credit*, 971 F.2d at 1075, citing *United States v. Tabor Court Realty Corp.*, 803 F.2d at 1304 (applying UFCA § 7 as enacted in Pennsylvania). "Fraudulent intent may be proved by conduct, but it must be proved and is not to be presumed." *Mason v. Wylde*, 308 Mass. 268, 282–283, 32 N.E.2d 615 (1941).

35. Despite the strictures in the case law and in the statute against presumed intent, courts applying UFCA § 7 agree that, for purposes of determining fraudulent intent, "a party is deemed to have intended the natural consequences of his acts." *United States v. Tabor Court Realty Corp.*, 803 F.2d at 1305, citing *In re Process–Manz Press, Inc.*, 236 F.Supp. 333, 347 (N.D.Ill.1964), *rev'd on other grounds*, 369 F.2d 513 (7th Cir.1966), *cert. denied*, 386 U.S. 957, 87 S.Ct. 1022, 18 L.Ed.2d 104 (1967). Massachusetts law is the same:

> [O]ne deeply in debt, who by a voluntary conveyance puts all his property out of the reach of his creditors, is presumed to intend the natural consequence of such a transfer which is to hinder, delay, or defraud his creditors, even if he had no such actual intent and even if the voluntary grantee was ignorant of the insolvency of the grantor or of any presumed or actual intent of his to prevent his creditors from applying the property to the payment of their claims.

*Mullins v. Riopel*, 322 Mass. 256, 260, 76 N.E.2d 633 (1948). Moreover, as this quote makes clear, the intent at issue in UFCA § 7 is that of the transferor and obligor, which is Morse—or, for all practical purposes, Lambert. Barclays' intent and good faith (or lack of it) are irrelevant to the Trustee's cause of action under § 7. They become relevant only as affirmative defenses under UFCA § 9. *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999 (S.D.N.Y.1991) (discussing UFCA § 7 as adopted in New York).

36. The Trustee's cause of action under this section is two-pronged. He first alleges that Lambert actually and deliberately intended to hinder and delay creditors in that he planned, before the buyout, to begin stretching the trade immediately after the buyout. And second, he alleges more generally that Lambert, by entering into the buyout transactions, deliberately depleted Morse's equity and "thrust an undercapitalized company into the market place to attract unwary creditors to inevitable loss."[45] *Barrett v. Continental Illinois Nat. Bank & Trust*, 882 F.2d 1, 5 (1st Cir.1989), quoting *Wells Fargo Bank v. Desert View Building Supplies*, 475 F.Supp. 693, 696 (D.Nev.1978), *aff'd*, 633

---

**45.** The Trustee does not use this precise language but it adequately summarizes his cause of action.

F.2d 225 (9th Cir.1980). And, since Lambert must be deemed to have intended the natural consequences of his actions, Morse had actual intent to hinder and delay creditors.

*Inadequate Capitalization*

37. As the Trustee alleges and as the Court has discussed at length above, the natural consequence of Lambert's entering into the buyout was to create a dangerously undercapitalized corporation without the long-term wherewithal to pay its debts as they came due. It was inevitable from the start that many creditors would at least be hindered and delayed, and it was probable that many would ultimately go unpaid. Morse must be deemed to have intended these natural consequences of Lambert's actions.

38. This raises the issue of whether, even in view of the above finding, the Trustee has proven a cause of action under UFCA § 7 where the Court has also found that Morse received adequate consideration for the obligations incurred and liens given in the buyout. The issue is whether an obligation or conveyance can be deemed fraudulent under UFCA § 7 where there is intent to hinder and delay creditors and injury to creditors (from inadequate capitalization) but also adequate consideration. There is no case law on this precise point under G.L. c. 109A, § 7. And in other jurisdictions, cases under UFCA § 7 in which LBO-related conveyances have been invalidated or challenged have involved transfers for no consideration.[46]

39. The Court rules that Morse's receipt of adequate consideration bars the Trustee's cause of action under G.L. c. 109A, § 7. In order to make out a cause of action under § 7, a creditor must show not only intent to hinder, delay or defraud, but also harm: a "hurtful act," "prejudice to creditors," or "actual fraud, hindrance, or delay." *Richman v. Leiser*, 18 Mass.App.Ct. 308, 312, 465 N.E.2d 796

(1984) (applying G.L. c. 109A, § 7). And the harm that fraudulent conveyance law is designed to remedy is the wrongful diminution of assets.

A conveyance is not established as fraudulent conveyance upon showing of a fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to creditors.

*Id.* at 312, 465 N.E.2d 796. In this instance, neither the buyout in general nor the Barclays loan transaction in particular diminished the assets available to creditors. If these caused injury to creditors, it was because they facilitated the creation and capitalization of an inadequately capitalized business entity. Absent proof that the Barclays loan was made for less than fair consideration, this kind of injury will not support a cause of action under G.L. c. 109A, § 7.

*Stretching the Trade; G.L. c. 109A, § 9(1)*

40. On the basis of what occurred after the buyout, it is clear that, when Lambert entered into the buyout, he intended to stretch trade payables to well beyond thirty and sixty days. Most of Morse's trade creditors required payment in thirty days. And before the buyout, the Divisions usually paid in less than ten days to take advantage of early-payment discounts. Things changed after the buyout. As of December 31, 1984, Morse had payables of $356,000 that were between thirty-one and sixty days old, and another $526,000 that were between sixty-one and ninety days old. (Broderick Dep., Ex. 12A, p. 13) Thus the stretch commenced soon after the buyout and substantially violated the credit terms. This was not caused, as Barclays contends, by Lambert's build-up of inventory, which would explain an increase in payables, but not in overdue payables. Rather, it was the effectuation of Lambert's prebuyout intent to augment cash flow by delaying payment to trade creditors. Therefore, the Court finds that the Trustee

---

**46.** *United States v. Gleneagles Investment Co.,* 565 F.Supp. 556, 580 (M.D.Pa.1983) (applying UFCA § 7 as adopted in Pennsylvania: "Where the transferor and transferee have knowledge of the claims of creditors and know that the creditors cannot be paid and where consideration is lacking for the transfer the Court may infer an intent to hinder, delay, or defraud creditors.");

has shown by clear and convincing evidence that when Morse entered into the buyout transactions, Lambert intended to hinder and delay creditors by stretching the trade payables, and creditors were harmed when Lambert effectuated this intent.

■■■ 41. However, this fraudulent intent was not part of Morse's agreement with Barclays. Barclays knew that Lambert intended to stretch the trade. Barclays even withheld credit advances to force Lambert to stretch the trade in the month after the buyout. But the Court cannot find by even a preponderance of the evidence that Barclays knew of or shared Lambert's intent to stretch the trade *beyond thirty days.* The evidence suggests that Barclays understood that Lambert intended only to take full advantage of the thirty day credit terms,[47] which would not have been fraudulent because creditors are not hindered or delayed by timely payment. The Court concludes by a preponderance of the evidence that Barclays did not have knowledge of Lambert's fraudulent intent at the time of the buyout.

■■■ 42. Therefore, the Court need not decide whether the Trustee has proven that the Barclays liens and obligations are fraudulent under G.L. c. 109A, § 7.[48] Even if he has, Barclays has established its defense under § 9(1).[49] The Court has found that Morse received fair consideration for the Barclays loan obligation and security interests, and that Barclays lacked knowledge of Lambert's intent to stretch the trade beyond thirty days. Therefore, Barclays was "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase," as against whom the Trustee may not obtain the relief specified in § 9(1). In sum, the Court concludes that judgment should enter for Barclays on the Trustee's count under G.L. c. 109A, § 7.

e. *Equitable Subordination*

43. In his final count, the Trustee contends that Barclays' claim should be equitably subordinated to the claims of general unsecured creditors. This count is predicated on the Trustee's allegations that Morse's dependence on Barclays gave Barclays "total control of Morse's fiscal affairs"; that Morse used its control to injure other creditors by agreeing with and forcing Lambert to stretch the trade payables; and that the resultant stretch delayed pay-

---

*Moody v. Security Pacific Business Credit,* 127 B.R. at 990 (same).

47. The evidence is thin and consists principally of a memo drafted by Richard Gagnon, head of Barclays' Northeast Region Office, dated July 30, 1984, in which Gagnon stated:

> To be worked out as part of the takeover process is withholding an additional $250M [$250,000 of credit availability] over a brief period of time following the closing, i.e. 30–45 days. This is based on Lambert's feeling that vendors can be stretched somewhat rather than Morse's continuing to discount payables as Gulf & Western has done.

Gagnon Dep., Ex. 1. The amount of the holdback, $250,000, was small in comparison to Lambert's build-up of accounts payable; and the holdback lasted, at most, only forty-five days, which was less time than it took Lambert to stretch the trade to any inequitable degree. The amount and duration of the holdback appear consistent with a stretch to thirty days, not to sixty or ninety. Moreover, there is no evidence that, after the buyout, Barclays directed Morse to delay payment of creditors.

48. It is not clear that the findings in paragraph 40 above establish a cause of action under G.L. c. 109A, § 7. First, Morse received fair consid-

eration, so even if the stretching of the trade was a wrong, I would find that it was not a fraudulent conveyance. And second, in order for a conveyance or obligation to be fraudulent under UFCA § 7, it must have been "incurred *with* actual intent . . . to hinder, delay or defraud." G.L. c. 109A, § 7. The conveyance and obligation must somehow be linked to the fraudulent intent. Where Lambert's fraudulent intent did not form part of his agreement with Barclays but was an integral part of the buyout as a whole, it is not clear that the necessary link is present.

49. Section 9(1) states:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser—
>
> (a) Have the conveyance set aside or annulled to the extent necessary to satisfy his claim, or
>
> (b) Disregard the conveyance and attach or levy execution upon the property conveyed.
>
> G.L. c. 109A, § 9(1).

ment of the trade payables, increased the unsecured debt, and insured that the risk of the buyout would be borne by the unsecured creditors. This was especially unfair, the Trustee argues, because Barclays knew of Morse's history of losses and its huge debt burden, while the unsecured creditors did not, and because Barclays itself was protected by its collateral from the risk of Morse's undercapitalization.[50] The net result was that Barclays improved its position to the detriment of the other creditors.[51]

44. Section 510(c) of the Bankruptcy Code permits the Court to,

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The judicially-developed principles of equitable subordination permit subordination where (i) the claimant has engaged in inequitable conduct; (ii) the misconduct has injured the debtor's creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *In re 604 Columbus Avenue Realty Trust,* 968 F.2d 1332, 1353 (1st Cir.1992), citing *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977). The doctrine of equitable subordination focuses on inequity *among creditors. In re Giorgio,* 862 F.2d 933, 939 (1st Cir.1988).

45. As the Court found above, the Trustee has failed to prove even by a preponderance of the evidence that Barclays forced or encouraged Morse to stretch the trade payables beyond the thirty days within which Morse was required to pay them. Therefore, the Trustee has not established that Morse engaged in inequitable conduct, so the Court must enter judgment for Barclays on the Trustee's count for equitable subordination.[52]

### f. *Conclusion*

46. The Court summarizes its rulings as follows.

a. On the Trustee's count under UFCA § 4, the Court rules that the Trustee lacks standing to proceed and that Morse received adequate consideration; on both grounds, judgment should enter for Barclays.

b. On the Trustee's count under UFCA § 5, the Court rules that the Trustee has standing under 11 U.S.C. § 544(b) and that the buyout transactions left Morse with unreasonably small capital; but, again, Morse received adequate consideration for the obligations incurred and security interests granted in the buyout, so judgment must enter for Barclays.

---

**50.** The misconduct on which this count is founded is Barclays' alleged participation in a scheme to stretch the trade. In conjunction with this count, the Trustee mentions Morse's undercapitalization only to "underline" the unfairness of this scheme. Trustee's Proposed Findings of Fact and Rulings of Law, p. 101. The Trustee does not also argue that Barclays' participation in the undercapitalization is itself misconduct warranting subordination. See *Matter of Mobile Steel Co.,* 563 F.2d 692, 702–704 (5th Cir.1977); *Matter of Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980); *In re Dry Wall Supply, Inc.,* 111 B.R. 933, 938 (D.Colo.1990); *In re Matter of Pinetree Partners, Ltd.,* 87 B.R. 481, 490 (Bankr.N.D.Ohio 1988).

**51.** The Trustee does not specify how the alleged scheme to stretch the trade improved Barclays' position.

**52.** The Trustee contends that Barclays had "total control" over Morse, so its inequitable conduct should be subject to the rigorous scrutiny applicable to fiduciaries and insiders of a debtor. *In re 604 Columbus Avenue Realty Trust,* 968 F.2d at 1360 (dealings between an insider and the debtor require rigorous scrutiny); *Matter of Teltronics Services, Inc.,* 29 B.R. 139, 171 (Bankr. E.D.N.Y.1983) ("In the rare circumstances where a creditor exercises such control over the decision-making processes of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard."). The Trustee's failure to prove that Barclays engaged in inequitable conduct renders this issue moot.

c. On the Trustee's count under UFCA § 7, the Court rules that Morse's receipt of adequate consideration bars the portion of the Trustee's cause of action based on intent to hinder and delay creditors by inadequate capitalization; and, because Barclays gave adequate consideration and lacked knowledge of Lambert's intent to stretch the trade, the Court rules that Barclays is entitled to judgment on the portion of the Trustee's cause of action based on fraudulent intent to hinder and delay creditors by stretching trade payables.

d. And, on the Trustee's count for equitable subordination, the Court rules that judgment should enter for Barclays because the Trustee has failed to prove that Barclays participated in the alleged inequitable conduct of stretching the trade.

On the basis of the findings and rulings set forth above, judgment should enter for Barclays on each of the counts asserted against it by the Trustee. Judgment will enter accordingly.

## JUDGMENT

For the reasons set forth in the separate memorandum of decision issued today,

It is hereby ORDERED and ADJUDGED that the objection of the Plaintiff, David J. Ferrari, as he is Trustee in Bankruptcy of Morse Tool, Inc., to the secured claim of the Defendant, Barclays Business Credit, Inc., is OVERRULED; that the Plaintiff's complaint for avoidance and equitable subordination of the Defendant's secured claim against the bankruptcy estate of Morse Tool, Inc., is DISMISSED ON THE MERITS; and that the Plaintiff take nothing.

## APPENDIX A

### RETIREE BENEFITS

The Trustee argues that as a result of the transactions of August 24, 1984, Morse assumed and became liable for G & W's obligation under a union contract to provide lifetime health and life insurance benefits to retired employees, which obligation the Trustee contends totalled $4,641,000. Barclays vigorously disagrees. It argues that the union contract entitled the retirees to benefits only for the duration of the contract, not for life; that in any case, Morse did not assume the liability in question; and that the Trustee's expert appraised the liability inaccurately.

### a. Did G & W Promise Benefits For Life?

The first issue raised with respect to Morse's alleged liability for retiree benefits is whether, under the collective bargaining agreement, retirees were entitled to such benefits for life, as the Trustee contends, or merely for the duration of the agreement, as Barclays contends.

### Findings of Fact

In August, 1982, G & W entered into a collective bargaining agreement ("the agreement") with the United Electrical, Radio, and Machine Workers of America and Local # 277 (collectively, "the union"). (Ex. 3) The agreement remained in effect on August 24, 1984.

In Article 17, entitled "Retirement," the agreement states:

17.03—BENEFITS: Any employee who, having attained age seventy years, must retire, as set forth in Paragraph 17.01 above [setting forth the time of mandatory retirement], or any employee who retires in accordance with the provisions of Paragraph 17.02 above [permitting voluntary retirement], shall, at the time of his retirement, be entitled to receive from the Company [G & W] the following retirement benefits:

. . . . .

17.032—LIFE INSURANCE: The Company, at its own expense, will provide and maintain ordinary life insurance coverage in the amount of one thousand five hundred dollars ($1,500) on the life of each employee who, having attained the age of sixty (60) years or more and who is retired prior to May 14, 1973 from its employ and two thousand dollars ($2,000) on the life of each employee who is retired subsequent to May 14, 1973 pursuant to the provisions of this Article 17, such insurance coverage to become effective

upon the thirty-second day after the retirement, in the case of an employee who has reached an age of 70 years, or, in the case of an employee who retired prior to 70 years of age, on the day following the date of retirement, and subject to the rules and regulations of the insurance company, to be payable to such beneficiary and beneficiaries as the employee may designate.

17.033—PENSIONERS AND DEPENDENTS OVER AGE 65: Medex III and reimbursement for Medicare Part "B."

．　　．　　．　　．　　．

17.04—IRREVOCABILITY: It is further mutually understood and agreed that no termination of this Agreement or any other collective bargaining agreement between the Parties, whether pursuant to their terms or otherwise, shall effect a termination of subparagraphs 2 to 5, inclusive, of this Article 17, it being agreed that those provisions of this Article 17, are to remain in full force and effect and binding on both Parties and the employees affected thereby until the end of the second shift which begins on May 10, 1985 regardless of any such termination of any such bargaining agreement.

(Ex. 3, p. 64)

In Article 16, entitled "Insurance," the Agreement also contains the following provisions:

16.01—GENERAL: The Company shall continue in effect during the life of this Agreement and shall bear the entire cost of the existing arrangement[1] relative to group life, accident, sickness, surgical and hospitalization insurance for its employees and, to the extent provided for by such existing arrangements, for specified dependents of each of its employees.... Benefits under such arrangements will continue to be subject to applicable terms, conditions and limitations as in the past, as summarized below:

16.02—SCHEDULE OF BENEFITS:

Active Employees:

| Life Insurance | $10,000 |
| Accidental Death and Dismemberment | 10,000 |
| Retired Employees | 2,000 |

．　　．　　．　　．　　．

Employees and dependents under age 70, pensioners under age 65: ...

Master Medical Health Policy: Blue Cross coverage shall be provided for the surviving spouse and children of all currently active employees, or for those who retire after May 4, 1973 and shall remain in effect for a period not to exceed ten (10) years.

16.03—INSURANCE DURING LAY-OFF: In case an employee is laid off the Company will continue to carry for the benefit of such employee for a period not to exceed a total of six (6) months in any benefit year, as defined below, all of the insurance set forth in Article 16 except life insurance and weekly accident and sickness benefit.

(Ex. 3, pp. 61–62.)

The agreement also contained the following general provisions with respect to its scope and duration:

1.02—SCOPE: This contract contains the entire Agreement between the Parties, and no matters shall be considered which are not covered by the written provisions stated herein.

1.03—DURATION: This Agreement shall remain in full force and effect and be binding upon the parties hereto until the end of the second shift which begins on May 10, 1985 and unless and until terminated by either Party, as hereinafter provided, for successive one year periods thereafter.

1.04—VOLUNTARY TERMINATION: Either party desiring to terminate this Agreement on May 10, 1985 or at the expiration of any succeeding one year period thereafter, may give notice of such termination in writing to the other Party not less than sixty (60) days prior to May 10, 1985 or prior to the expiration

---

1. Neither party has submitted evidence as to the nature of "existing arrangements" referred to in this paragraph.

of such succeeding one year period as the case may be, and upon the giving of such notice, this Agreement shall terminate on May 10, 1985 or at the expiration of such succeeding one year period, as the case may be.

(Ex. 3, p. 9)

The parties disagree as to the propriety of resorting to extrinsic evidence, but the issue is moot. The extrinsic evidence of intent that has been submitted is so uniformly thin, remote, and speculative as to merit no weight.

The Trustee's extrinsic evidence consists solely of Exhibit 112, the Consolidated Financial Statements of LCI, Inc., dated July 31, 1985. (LCI, Inc. had by then become Morse's parent corporation.) The Consolidated Statements include a note regarding insurance for retirees, which states:

Effective August 24, 1984, the Company assumed responsibility for funding the health and life insurance benefits for retirees of Morse Cutting Tool. Accordingly, the present value of the estimated future insurance payments was recorded as a liability at date of inception. The interest rate used to estimate the present value of this liability approximates that of the Company's bank borrowings at August 24, 1984. This liability is being amortized over approximately 15 years.

I find on the basis of this statement that LCI believed it was obligated to pay retiree benefits of some kind, but the value of this statement as evidence of G & W's intent to grant lifetime benefits is doubtful at best. First, the statement does not indicate whether the retiree benefits at issue were lifetime benefits. It speaks of "future insurance payments," but this could refer to payments due under the unexpired portion of the collective bargaining agreement,[2] not necessarily to payments due after expiration of the agreement. Second, the statement is a conclusion without a stated justification: it states neither its author's basis

for believing that G & W was liable for retiree benefits nor the author's knowledge, if any, of G & W's negotiations with the Union and of the parties' intent. In fact, the identity of the person or persons who drafted this document is unknown. And the corporate author was LCI, not G & W, the corporation that negotiated the collective bargaining agreement. Therefore, I give the statement no weight as evidence of intent to confer lifetime benefits. And Barclays' extrinsic evidence of intent is equally insubstantial. I conclude that the extrinsic evidence of intent is useless.

*Arguments*

Citing the lead case of *UAW v. Yard-Man*, 716 F.2d 1476 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) ("*Yard-Man*"), and the decision of the First Circuit Court of Appeals in *United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6 (1st Cir.1987) ("*Textron*"), the Trustee argues that the retiree benefits granted in the agreement are "status benefits" which, by their nature, carry "an inference that they continue as long as the prerequisite status [retirement] is maintained." *Yard-Man*, 716 F.2d at 1482. The Trustee also argues that the agreement uses the term "entitled" only with respect to retirement benefits and thereby clearly shows the parties' intent to confer those benefits for life.

Barclays' response, in short, is that the relevant cases hold that retiree benefits should not be deemed lifetime benefits unless the agreement expressly so provides or, where the language is ambiguous, extrinsic evidence shows that the parties intended lifetime entitlement. Barclays points out that the agreement does not expressly provide that the benefits it promises shall be provided for life. Rather, the irrevocability clause governing the retirement benefits portion of the agreement states that the provision granting retirement benefits terminates on May 10, 1985.

---

**2.** On August 24, 1984, the collective bargaining agreement had not yet expired. According to its terms, it was to extend until at least May 10, 1985; and after that date, the contract was to continue in effect unless, within 60 days before May 10, 1985, or before the expiration of any succeeding one-year period thereafter, either party gave notice of termination to the other.

*Governing Law*

Contrary to the Trustee's suggestion, the First Circuit's *Textron* decision does not "explicitly endorse" or even address *Yard–Man's* holding that where benefits are promised to retirees, that fact alone gives rise to an inference that the benefits were intended to be lifetime benefits. In *Textron*, the Steelworkers union sought a preliminary injunction enforcing provisions in several collective bargaining agreements under which retirees were entitled to health and life insurance benefits. The District Court agreed with the union that under the provisions, the retirees were entitled to such benefits for life, not merely for the duration of the agreement, and therefore ordered Textron to continue providing the benefits. On appeal from the order, the Court of Appeals summarized the parties' arguments but did not weigh them. Rather, it only determined that on the record presented, the District Court could find that the Union had shown a likelihood of success on the merits. *Textron*, 836 F.2d at 9–10. In its opinion, however, the Court stated:

> The contract language—retiree medical benefits "shall be provided" and the "Company shall pay" for retiree insurance—is consistent with a Textron promise to pay retirees' insurance costs throughout their retirement, even after the particular collective bargaining agreement expires. *See, e.g., UAW v. Yard–Man, Inc.*, [citation omitted] ("will provide" supports this interpretation); *Upholsterer's International Union v. American Pad & Textile Co.*, 372 F.2d 427 [ (6th Cir.1967) ] (same in regard to "will continue").

*Textron*, 836 F.2d at 9. This sentence occurs in a two-paragraph passage in which, except in this sentence, the Court of Appeals clearly is only summarizing the arguments and evidence that constituted the record on which the District Court rendered its decision, so it is not clear that the above sentence is a ruling of law, as the Trustee contends, and not merely a recitation of the Union's lead argument. More likely it is the latter: its context suggests it is a recitation of the Union's argument; the Court of Appeals seldom decides such complex issues in a single sentence; and the Court stated clearly, "at this stage of the proceedings, we need not weigh these conflicting arguments." *Textron*, 836 F.2d at 9. But even if it is a ruling of law, its reach is modest: it states only that the quoted contract language "is consistent with" a promise to pay such benefits for life. This hardly provides the full analytical framework needed to resolve the issues presented in that case and in this one, which arise precisely because the contract language is consistent with *both* of the competing interpretations. Therefore, the Court must look beyond *Textron* for guidance on this issue.

*Yard–Man* usefully summarizes the law governing the duration of retiree benefits granted in collective bargaining agreements. Federal labor law governs the interpretation of collective bargaining agreements, *Yard–Man*, 716 F.2d at 1479, but it applies traditional rules of contractual interpretation "as long as their application is consistent with federal labor policies." *Id.* The *Yard–Man* Court found no federal labor policy that would "presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent," *Yard–Man*, 716 F.2d at 1482, so it construed the issue of the duration of retiree benefits purely as one of contract law and therefore of discerning the parties' intent. "[W]hether retiree benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties." *Yard–Man*, 716 F.2d at 1479. The employer may agree to provide retiree benefits that continue beyond the termination of the agreement, but "[a]ny such surviving benefit must necessarily find its genesis in the collective bargaining agreement." *Id.* On these points, the courts that have addressed this issue agree.[3] And the courts

---

**3.** See, for example, *Senn v. United Dominion Industries*, 951 F.2d 806, 814 (7th Cir.1992), *reh'g en banc denied*, 962 F.2d 655 (1992), *petition for cert. filed* (August 3, 1992) ("[I]n the absence of an agreement to the contrary, a company is not obligated to continue retiree

agree as well on the basic and familiar principles of contract interpretation that the *Yard–Man* court identified as appropriate for discerning the parties' intent in collective bargaining agreements, which principles this Court, too, adopts. See *Yard–Man*, 716 F.2d at 1479–1480.

However, one of *Yard–Man*'s holdings— the one on which the Trustee relies—has proven more controversial than the rest: the holding that retiree benefits carry an inference that they continue throughout retirement.[4] *Yard–Man*, 716 F.2d at 1482. The *Yard–Man* court itself qualified this holding by explaining that it was not holding that retiree insurance benefits are necessarily interminable by their nature, *id.*, or that federal labor policy favors the finding of interminable rights where the agreement is silent. *Id.* And, most importantly, it held that the inference of intent, standing alone, would "be insufficient to find an intent to create interminable benefits." *Id.* Rather, the court relied on the inference merely to buttress the already sufficient language of intent in the collective bargaining agreement. *Id.*

*Yard–Man*'s holding with respect to status benefits and the inference of intent has not been widely followed. The Fourth Circuit Court of Appeals followed it in *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 64 (4th Cir.1989), but, as in *Yard–Man*, only to buttress the already sufficient evidence of intent contained in the agreement itself and in extrinsic evidence. This Court has found no case that relied on *Yard–Man*'s infer-

ence as the basis for its conclusion, and not merely to buttress an otherwise justified conclusion that benefits were meant to continue.

Three federal courts of appeals have rejected *Yard–Man*'s inference of intent to create lifetime benefits. In *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir.1988), *cert. denied*, 489 U.S. 1051, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), the Eighth Circuit stated:

> [W]e disagree with *Yard–Man* to the extent that it recognizes an inference of an intent to vest. Congress explicitly exempted welfare benefits from ERISA's vesting requirements. It therefore seems illogical to infer an intent to vest welfare benefits in every situation where an employee is eligible to receive them on the day he retires. The court in *Yard–Man* recognized that no federal labor policy presumptively favors vesting. Because Congress has taken a neutral position on this issue "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." *Yard–Man*, 716 F.2d at 1479. We believe that it is not at all inconsistent with labor policy to require plaintiffs to prove their case without the aid of gratuitous inferences.

*Id.* The Fifth Circuit agreed with *Anderson* in *United Paperworkers International Union, AFL–CIO v. Champion International Corp.*, 908 F.2d 1252, 1261 n. 12 (5th Cir.1990). The Seventh Circuit, without commenting on *Yard–Man* itself,

---

welfare benefits after the expiration of the contract."); and *District 29, United Mine Workers of America v. Royal Coal Co.*, 768 F.2d 588, 590 (4th Cir.1985) (whether obligation to provide benefits to retirees continues beyond expiration of collective bargaining agreement is primarily a question of contract interpretation and depends on parties' intent).

**4.** The court made two arguments in support of this holding. The first looked to the legal context in which retiree benefits are bargained for. The court observed that unions are under no obligation to bargain on behalf of retirees and that retiree benefits are commonly understood as a form of compensation for past services. Therefore, the court reasoned, current employees who bargain for retirement benefits will

naturally want assurance that once they retire, their benefits will continue and not be subject to future negotiations. And so it is likely that the parties who bargain to provide retirement benefits will intend that they be continuing benefits.

The second argument is that retiree benefits are "status benefits." The court stated:

> [R]etiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.

*Yard–Man*, 716 F.2d at 1482.

has gone further by taking the position that any collective bargaining agreement that is silent regarding the duration of retirement benefits is not ambiguous. Rather, it should be interpreted as creating a right to such benefits only for the duration of the agreement, and extrinsic evidence to the contrary should not be considered:

> The default rule in this Circuit is that "entitlements established by collective bargaining agreements do not survive their expiration or modification." *Merk* [*v. Jewel Cos., Inc.*, 848 F.2d 761 (7th Cir.1988), *cert. denied*, 488 U.S. 956, 109 S.Ct. 393, 102 L.Ed.2d 382 (1988) ] at 763. Thus it requires more than a statement in a [collective bargaining agreement] that welfare benefits "will continue" to create an ambiguity about vesting, for the logical interpretation under our rule is that benefits "will continue" for the duration of the contract.... The mere silence of Collective Bargaining Agreements and plan documents concerning the vesting of welfare benefits fails to give rise to an ambiguity.

*Senn v. United Dominion Industries, Inc.*, 951 F.2d at 816.

This Court agrees with both the holding and reasoning of the Eighth Circuit's *Anderson* decision: the plaintiffs must prove their case without the aid of the "gratuitous inference" that every grant of retiree benefits is meant to vest. I accordingly reject *Yard–Man*'s concept of status benefits and its inference of intent to create lifetime benefits. But I also reject the Seventh Circuit's default rule—the rule that Barclays in essence advocates—that agreements that are silent as to duration are not merely ambiguous but are to be construed as limiting such benefits to the duration of the agreement. Rather, I hold that silence is indeed ambiguous. And although the inference of intent to vest does not apply automatically and as a general proposition to all grants of retiree benefits, this would not prevent the district court from considering, as some evidence of intent, for example, the fact that retirees have no voice in negotiating a new collective bargaining agreement, a fact of quite general applicability to cases where the vesting of retirement benefits is at issue. In other words, this matter must be determined on a contract-by-contract basis.

*United Paperworkers International Union, AFL–CIO v. Champion International Corp.*, 908 F.2d at 1261–1262 n. 12. Or, more generally put, the factors that gave rise to *Yard–Man*'s concept of status benefits and to its inference of intent may serve as evidence of intent to vest, but only to the extent that they can be shown to have factored into the negotiation of the contract in question. The weight to be accorded these factors is a question of fact to be adjudicated on a case-by-case basis.

*Discussion*

Turning to the present case, the Court first concludes that the extrinsic evidence should, as a matter of fact (not of law), have no bearing on this adjudication of intent. As I concluded above, the extrinsic evidence of intent is so uniformly thin, remote, and speculative as to merit no weight. Having determined that the extrinsic evidence is of no help and that the Trustee cannot invoke *Yard–Man*'s inference of intent, I conclude that the Trustee's case for lifetime benefits must rest solely on the collective bargaining agreement, to which I now turn.

Article 17 of the agreement, the principal article on retirement benefits, does not expressly state the duration of the retirement benefits it enumerates. It simply states (in ¶ 17.03) that upon retirement, employees "shall ... be entitled to receive" the listed benefits. The Trustee argues that the use of the word "entitled" clearly implies lifetime duration because no other provision of the agreement uses the word entitled. The Court disagrees. The term entitled *is* used elsewhere in the agreement in places where it clearly does not signify vested or lifetime benefits. See ¶ 7.031 ("Vacation pay for an employee entitled to paid vacation of one-half week or one full week ... shall be equal to two percent (2%)"; the term occurs seven times in this paragraph) and ¶ 7.032 ("Employees who have been laid off

or have become deceased at any time during the year shall be entitled to a prorated vacation pay."). In any case, "entitled" means possessed of the right to something; it suggests nothing about duration.

Both parties find support for their positions in ¶ 17.04, the subparagraph on irrevocability. It states: notwithstanding any termination of the collective bargaining agreement, subparagraphs 2 through 5 of Article 17—including the subparagraph that provides for retirement benefits, ¶ 17.03—"are to remain in full force and effect and binding on both Parties and the employees affected thereby until the end of the second shift which begins on May 10, 1985." Barclays argues that this subparagraph should be construed as limiting the duration—or more precisely, the irrevocability—of the retiree benefits conferred in ¶ 17.03. The Trustee, on the other hand, argues that the irrevocability provision applies only to employees, not to retirees. Its silence with respect to retirees should be construed as prohibiting the revocation of benefits to which retirees, upon their retirement, became entitled.

The Trustee's argument is implausible. Subparagraph 17.04 uses the word employees and not retirees, but it is clear that in Article 17, retirees are a subcategory of employees; that is, "employees" includes both those who are active and those who are retired. In fact, Article 17 deals exclusively with retirees but never uses the term "retiree." Instead, it uses phrases such as "employee who ... must retire," "employee who retires," and "employee who is retired." See ¶¶ 17.03 and 17.032. So the absence of the word retiree does not exclude retirees from the scope of the limitation on irrevocability. Rather, it is clear that "employees" includes retirees and that the limitation applies to retirees.

This leaves the question of what the limitation limits, which is the subject of Barclays' argument. Barclays interprets ¶ 17.04 as limiting the irrevocability of any

retiree benefits conferred in ¶ 17.03. The Court disagrees. Subparagraph 17.04 controls the revocability of certain subparagraphs, "subparagraphs 2 to 5, inclusive, of this Article 17"; it does not expressly or directly limit benefits. Therefore, although ¶ 17.04 permits the Company to revoke ¶ 17.03 and thereby to prevent employees from becoming entitled to retiree benefits after the date of revocation, it does not authorize the Company to revoke the benefits (if any) to which employees become entitled before revocation. And except insofar as it permits the Company to terminate ¶ 17.03 after the end of the second shift on May 10, 1985, ¶ 17.04 states nothing about the duration of the benefits to which retirees are entitled under ¶ 17.03. I conclude that Article 17 is ambiguous as to the duration of the retiree benefits it creates.

Except as has already been discussed, neither party has cited any provision of the agreement outside of Article 17 as bearing on the interpretation of ¶ 17.03 or on the question of duration. Still, the Court should consider the entire agreement in order to interpret the specific provision consistently with the remainder. *Yard–Man*, 716 F.2d at 1479. In particular,

> [w]here ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous.

*Yard–Man*, 716 F.2d at 1480.

Article 16 of the agreement, which governs insurance benefits and is not a model of clear drafting, is set forth above in the findings of fact.[5] It contains several durational provisions that are relevant in two ways. They specify the duration of some of the retiree benefits promised in ¶ 17.03. And, with respect to the retiree benefits for which they do not specify a duration, the

---

5. The record contains no extrinsic evidence of the meaning of this Article or of its relation to the provisions in Article 17.

presence of durational limits in Article 16 permits the Court to infer from the absence of durational limits in ¶ 17.03 that the parties intended to create unlimited, lifetime benefits.

With respect to life insurance, ¶¶ 16.01 and 16.02 together promise retirees coverage in the amount of $2,000 during the life of the agreement. This reading renders ¶ 17.032 partly superfluous: ¶ 17.032 specifies in greater detail the life insurance coverage promised to retirees. And it also contradicts ¶ 17.032 in part: ¶ 17.032 promises coverage of $2,000 to most retirees but only $1,500 to retirees over age 60 that retired before May 14, 1973. Still, with respect to the durational limit, Article 16 neither duplicates nor contradicts ¶ 17.032; and I see no way to read Article 16's promise of life insurance to retirees that avoids these problems of duplication and contradiction.[6] So I conclude that Article 16 applies to the life insurance benefits promised in ¶ 17.032 and limits the duration of such benefits to the life of the agreement.

But Article 16's durational provisions appear not to apply to the *medical* insurance promised to retirees in Article 17. Under the heading Master Medical Health Policy ("MMHP"), Article 16 contains a promise of Blue Cross coverage "for a period not to exceed ten (10) years" to those who retire after May 4, 1973. But this MMHP promise of retiree benefits appears under the more general heading, "Employees and dependents under age 70, pensioners under age 65," and therefore is limited to retirees who satisfy those age requirements. In Article 17, on the other hand, the promise of medical insurance extends to "pensioners and dependents over age 65"; they are promised Medex III and reimbursement for Medicare Part B. Therefore, with respect to medical insurance for retirees, Articles 16 and 17 appear to cover different age categories; their provisions do not overlap.

I conclude that the durational limit in Article 16 does not apply to the promise of medical insurance in Article 17.

More importantly, the presence of durational limits in Article 16 and the absence of such limits in ¶ 17.033 gives rise to an inference that the parties to the agreement intended that the medical benefits promised to retirees in ¶ 17.033 were intended to be lifetime benefits. Article 16 contains three durational limits on insurance benefits: the general limit in ¶ 16.01 that the insurance promised in that section was to "continue in effect during the life of this agreement"; ¶ 16.02's statement that retirees' Blue Cross coverage was to "remain in effect for a period not to exceed ten (10) years"; and ¶ 16.03's statement that insurance for laid-off employees was "not to exceed a total of six months in any benefit year." The absence of durational limits from ¶ 17.033 thus appears purposeful.

[T]he inclusion of specific durational limitations in other provisions of the collective bargaining agreement suggests that retiree benefits, not so specifically limited, were intended to survive the expiration of successive agreements in the parties' contemplated long term relationship. *Yard–Man,* 716 F.2d at 1481–1482. Therefore, I conclude that the parties to the agreement intended that upon retirement, employees would become entitled to the specified medical coverage for life.

To summarize, I conclude, with respect to life insurance coverage, that the collective bargaining agreement limited the duration of retirees' coverage to the duration of the agreement. It did not obligate the company to provide life insurance after the agreement expired, not even to those who retired before the agreement expired. And with respect to medical insurance coverage, the agreement provided that any employee who retired before the agreement expired became, upon retirement, entitled to benefits for life. However, the obligation to

---

**6.** No alternative reading is more plausible. To construe Article 16's promise of life insurance to retirees as an additional promise to the one in Article 17 would be even more bizarre. It is more likely that the drafters simply dealt with the same benefits in two different places—per-haps because they fell under two headings, retirement and insurance—than that they intended two separate grants of life insurance benefits. The grants are identical in amount with respect to most employees.

provide medical insurance for life did not extend to all employees, regardless of when they retired; by virtue of ¶ 17.04, it extended only to those employees who retired before the end of the second shift on May 10, 1985.[7]

b. *Did Morse Assume the Obligation?*

Barclays next argues that if G & W did have an obligation to provide lifetime benefits, Morse did not assume it. Barclays argues that the Bill of Sale and Assignment and Assumption Agreement (Stip., Ex. C), which documented Morse's assumption of G & W's obligations, expressly excluded the obligation to provide medical and life insurance benefits from those being assumed by Morse. The Trustee responds that the disclaimed obligation relates only to medical and life insurance "plans," not to obligations under the collective bargaining agreement. Also, Morse expressly agreed to be bound by all terms of the agreement.

The relevant language in the Bill of Sale and Assignment and Assumption Agreement states that G & W transferred to Morse all the businesses, operating assets, and properties of the Morse Cutting Tool Division and Super Tool Division (collectively, "the Division"),

> SUBJECT, HOWEVER, to all of Assignor's [G & W's] obligations, indebtedness and liabilities relating to the business, assets and liabilities being transferred hereunder, *except for ... (4) liabilities relating to any medical or life insurance plan of the Division,* other than payments for retired salaried employees of the Division or Assignee [Morse] required, with respect to costs incurred in any period after the transfer of the shares of Assignee to MCT, Inc., by the terms of the Gulf & Western Manufacturing Company Salaried Medical Program.

Bill of Sale and Assignment and Assumption Agreement (Stip., Ex. C) at 3–4 (emphasis added). Nothing in the Bill of Sale and Assignment and Assumption Agreement defines "plan" or identifies the plans referred to in the above passage.

The only extrinsic evidence of the parties' intent as to the scope of the above exclusion consists of portions of the Agreement for Sale of All Shares of Morse Tool, Inc. The Trustee cites paragraph 8.1 of the Agreement:

> 8.1 Buyer [MCT, Inc.] agrees that the Corporation [Morse] shall remain fully and exclusively bound by all terms and conditions of the collective bargaining agreements listed on Exhibit M in effect on the Closing Date and all rights and benefits deriving from such agreement shall remain in full force and effect solely against the Corporation.

Agreement for Sale of All Shares of Morse Tool, Inc. (Stip., Ex. D), ¶ 8.1. The Exhibit M referred to in this paragraph lists first pensions plans and then (by reference to Exhibit I to the Agreement) union contracts. Among the union contracts listed is G & W's agreement with the United Electrical, Radio and Machine Workers of America and Local 277, the agreement under which the Court found above that G & W was obligated to provide lifetime medical insurance coverage to certain retirees.

Barclays is relying on an express exclusion and therefore bears the burden of proving that the exclusion applies to the obligation in question. Barclays has not satisfied this burden. I conclude that the language that Barclays cites from the Bill of Sale and Assignment and Assumption Agreement does not exclude the obligation under the union agreement to provide lifetime medical insurance coverage to certain retirees. I do so for two reasons. First, I have no evidence that G & W maintained a medical insurance plan to satisfy its obligations under the union agreement. Second, the Agreement for Sale of All Shares

---

7. The language of the agreement clearly demonstrates the parties' understanding that the Company's obligations extend to those who retired before the agreement was entered into. In ¶ 17.032, the agreement distinguishes between employees who retired before May 14, 1973, and those who retired after that date. This would be meaningless if the parties did not intend to extend benefits to those who retired before the 1982 agreement became effective.

of Morse Tool, Inc., which was negotiated and executed with the Bill of Sale and Assignment and Assumption Agreement, distinguishes between plans and union agreements; and in common usage, the terms are not interchangeable. For these reasons, I find that the parties did not intend for the terms to be interchangeable. And, as the Trustee argues, G & W's obligation to provide retiree health insurance arises under an agreement, not under a plan. I conclude that Morse assumed G & W's obligation under the union agreement to provide lifetime medical insurance coverage to certain retirees.

### c. Did the Trustee Correctly Appraise the Obligation?

Barclays argues that the Trustee's expert, Edward E. Burrows, incorrectly appraised Morse's liability for retiree benefits. Burrows, a qualified actuary, testified that in his opinion, Morse's liability for retiree health benefits and life insurance as of August 24, 1984, was as follows:

**Health benefits:**

| | |
|---|---|
| Persons who were retirees at the time | $2,399,060 |
| Active workers likely to retire | 1,848,940 |
| Total | $4,248,000 |

**Life insurance:**

| | |
|---|---|
| Persons who were retirees at the time | $312,000 |
| Active workers likely to retire | 81,000 |
| Total | $393,000 |

Burrows' calculations with respect to life insurance benefits were based on the inaccurate assumption that Morse was obligated to provide life insurance coverage after the expiration of the 1982 collective bargaining agreement. (Tr. 12/11/90, p. 38) The Court has concluded that the company's obligation to provide life insurance coverage to retirees was limited by ¶¶ 16.01 and 16.02 of the agreement to the duration of the agreement. The agreement was subject to termination and renegotiation as early as May 10, 1985. It follows that as of August 24, 1984, Morse was obligated to fund life insurance coverage for retirees for only approximately 8.5 months, which would yield a much smaller liability than Burrows estimated. How much smaller is impossible to determine: Burrows did not estimate the cost of coverage for only 8.5 months; and the Trustee has not supplied the evidence necessary to permit the Court to estimate it. The Court therefore concludes that Burrows' opinion of Morse's liability for retiree life insurance should be rejected. And, the Trustee having failed to provide a credible estimate of Morse's limited liability for retiree life insurance, I conclude that this liability is zero.

With respect to health insurance, Burrows' calculation of Morse's obligation was based on the erroneous assumption that Morse was obligated to provide lifetime benefits to all its future retirees, regardless of when they retired. Burrows did not assume that all active workers would retire (Tr. 12/11/90, pp. 50–51), but he did assume that Morse was obligated to provide benefits for life to all who would eventually retire. (Burrows' Affidavit, p. 6) The Court has concluded that the obligation Morse assumed from G & W was to provide lifetime benefits only to those who retired before the end of the second shift on May 10, 1985. This does not render Burrows' calculation inaccurate as to persons who were retirees as of August 24, 1984, but it does require rejection of his estimate as to active workers who were likely to retire. Again, neither Burrows nor the Trustee has supplied the evidence necessary to calculate Morse's liability with respect to employees who were active as of August 24, 1984, but likely to retire on or before May 10, 1985. The Trustee having failed to carry his burden on this issue, I find that this liability is zero.

Barclays argues that Burrows' opinion is inaccurate in four additional respects. First, it argues that Burrows' calculation was premised on the retirees' receiving Medex III coverage for life, but that such coverage was terminated as of May 31, 1987. The Court holds that whether such coverage was terminated is irrelevant. The crucial fact is that on August 24, 1984,

Morse was obligated to provide lifetime coverage to certain employees.

Second, Barclays argues that Burrows did not know whether the demographic data (regarding workers and families covered by the Morse Cutting Tool Pension Plan) on which he based his calculations regarding liability for medical benefits had been updated through August 24, 1984. The Court disagrees and finds that although Burrows relied on a study dated July, 1983, he also determined that using this data for an August, 1984, calculation would not make a material difference. (Burrows Affidavit, p. 3; Tr. 12/11/90, p. 65)

Third, Barclays argues that Burrows' calculation is arbitrary because, at his deposition, he stated that Morse's liability for retiree benefits was $2,020,000, much less than the $4,248,000 figure he offered at trial. This argument misstates Burrows' testimony. Burrows testified at his deposition that the $2,020,000 figure was his opinion of the amount of Morse's liability for retiree benefits (both medical and life insurance) with respect to persons already retired. (Tr. 12/11/90, p. 35) It did not include the amount owed to active employees who were likely to retire.

Nonetheless, Barclays has pointed out an unexplained discrepancy. Burrows testified at trial that Morse's liability to those already retired was $2,399,060 for health benefits and $312,000 for life insurance, a total of $2,711,060, which is $691,060 more than the $2,020,000 he testified to at his deposition. Burrows attempted to explain this discrepancy by stating that, at the deposition, he had qualified his opinion by saying, "there was more information coming," that his opinion was subject to change on the basis of information he had not yet received. But Burrows did not testify that he did receive new information after the deposition; nor did he explain how the new information changed the result by nearly $700,000. And the Trustee has not put in

evidence the calculations and data that form the basis of Burrows' ultimate opinion. Therefore, I reject Burrows' $2,711,060 figure and find instead that Morse's obligation for retiree benefits did not exceed $1,708,000 for health benefits.[8]

Fourth, Barclays argues that Burrows was not an expert in the proper accounting treatment of retiree benefits and therefore was not qualified to offer an opinion as to whether an employer's liability for retiree benefits should appear on its balance sheet. The Court finds this to be true but irrelevant. Burrows testimony was offered and received only for his opinion as to the amount of the liability, not as to whether, under generally accepted accounting principles, the liability should appear on the employer's balance sheet.

#### d. Conclusion

The Court summarizes its findings and rulings as follows. As of August 24, 1984, G & W was obligated under the collective bargaining agreement to provide life insurance benefits to retirees only during the term of the agreement and to provide health insurance coverage for life only to those who retired before the agreement expired, the end of the second shift on May 10, 1985. Morse assumed these obligations from G & W. With respect to the amount of these obligations, the Trustee has submitted credible evidence only regarding the present discounted cost (as of August 24, 1984) of funding the obligation to provide health insurance to persons who were retirees as of August 24, 1984. He provided no evidence as to the cost of funding health benefits for persons who were likely to retire between August 24, 1984, and the end of the second shift on May 10, 1985. And he provided no evidence as to the cost of funding life insurance benefits for retirees for the remainder of the agreement's duration. Therefore, my conclusions as to Morse's liability for retiree benefits as of August 24, 1984, are as follows:

**8.** The $1,708,000 figure is derived by subtracting the amount that Burrows believed was owed for life insurance, $312,000, from the total amount

he believed (at his deposition) was owed to those already retired, $2,020,000.

**Health benefits:**

| | |
|---|---|
| Persons who were retirees at the time | $1,708,000 |
| Active workers likely to retire | 0 |

**Life insurance:**

| | |
|---|---|
| Persons who were retirees at the time | 0 |
| Active workers likely to retire | 0 |
| Total | $1,708,000 |

## APPENDIX B

### UNDERTAKING LIABILITY

The Trustee argues that Morse's postclosing liabilities included a $2.1 million obligation to G & W arising from the Undertaking. The parties agree and the Court finds that this obligation was a contingent, alternative liability. Morse could satisfy the Undertaking in either of two ways. The Undertaking required that Morse,[1] on the fifth anniversary of August 24, 1984, either (a) pay G & W the amount of $2.1 million, plus interest at 10 per cent per annum from August 24, 1984, or (b) certify to G & W that certain pension plans had, since August 24, 1984, met the minimum funding standard set forth in section 302 of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Stip. Ex. G) In other words, Morse's obligation to pay $2.1 million plus interest to G & W was contingent on Morse's failing to satisfy ERISA's minimum funding requirements for five years.

The Trustee argues, and Barclays denies, that the buyout left Morse without resources to satisfy its pension funding obligations, making default on the Undertaking inevitable. Default was inevitable because the pension funding obligations "would require the Trustee to come up with large sums of cash," sums that would be difficult for the company to raise, given Morse's lack of cash and of unencumbered assets and the size of its postclosing debt burden. More generally, the Trustee also argues that Morse lacked the long-term wherewithal to pay its debts as they came due and thus was likely to fail as a whole and, therefore, to default on its pension funding obligations.

The value of a contingent liability is a function of the likelihood of its becoming an absolute liability: value = (amount of liability) × (probability that it will become absolute). Therefore, the parties are correct to focus on the likelihood of default.

In order to avoid the $2.1 million liability, the Undertaking required that Morse meet "the minimum funding standards [sic [2]] set forth in section 302 of ERISA in effect on the date hereof [August 24, 1984]." Section 302 of ERISA, codified at 29 U.S.C. § 1082, establishes a complex formula for determining the minimum contribution an employer must make to its pension funds in a given year. Drastically simplified, ERISA's minimum funding standard requires an employer to contribute to the plan in any given year (a) the normal cost of the plan for the plan year [3] and (b) the amount necessary to amortize the underfunding in equal annual installments, less certain credits. 29 U.S.C. § 1082(a), (b)(1–3).

"Underfunding" refers to the extent by which the present value of expected plan liabilities exceeds the value of the plan's assets. ERISA § 302 requires employers to amortize underfunding over time, with the period of amortization varying—from 5 to 40 years—according to the types of underfunding involved. 29 U.S.C. § 1082(b)(2) (as amended by Pub.L. 96–364,

---

**1.** The principal obligor and signer of the Undertaking was MCT, Inc.; Morse signed the Undertaking as a guarantor. Later, by virtue of MCT's merging with Morse, with Morse being the surviving corporation, Morse became the sole obligor.

**2.** The statute speaks of a minimum funding "standard," not standards.

**3.** "Normal cost" is defined as "the annual cost of future pension benefits and administrative expenses assigned, under an actuarial cost method, to years subsequent to a particular valuation date of a pension plan." 29 U.S.C. § 1002(28).

Title III, § 304(b), Sept. 26, 1980, 94 Stat. 1293).[4]

The credits that may reduce the minimum contribution include credits for changes in actuarial assumptions, for decreases in plan liability, and for a "waived funding deficiency." 29 U.S.C. §§ 1082(b)(3). The latter is that portion of the minimum required contribution that the Secretary of the Treasury may waive where application of the minimum funding standard would impose substantial business hardship on the employer and be adverse to the interests of plan participants in the aggregate. 29 U.S.C. § 1083.

The Trustee appears to have assumed that it was self-evident that the minimum contributions due under ERISA § 302 would be of such magnitude throughout the five years after the buyout that Morse could not possibly have avoided defaulting on them. In support of his argument that default was inevitable, the Trustee has submitted almost no argument and little evidence as to the amount, nature, and timing of Morse's obligations under the statute.

a. The evidence that the Trustee has submitted consists of the testimony of Edward Burrows, an actuary. He testified that, in his expert opinion, the Morse Cutting Tool Pension Plan was underfunded, as of August 24, 1984, by the amount of $3,752,179 for its vested pension liability, and by an additional $118,242 for unvested liability. (Burrows Affidavit, p. 8) And he further testified that the Super Tool/Local 982 Retirement Plan was in balance, not underfunded. (Tr. 12/11/90, pp. 62–63) I accept as true Burrows' testimony as to both plans and therefore find that the total underfunding at the time of the buyout was $3,870,421. (The Trustee offered evidence as to the third of the three plans that the Undertaking required Morse to fund.)

b. The evidence also indicates that Morse assumed G & W's accrued pension obligation in the amount of $1,061,594.00, which was payable in two installments, due in May, 1985, and May, 1986. However, the Court lacks evidence as to how much (if any) of such obligation constituted the minimum funding contribution for those years.

c. The Trustee has submitted no projections or expert testimony as to the contributions necessary to satisfy the minimum funding standard for the five years in question. And, aside from Burrows' testimony regarding underfunding, the Trustee has submitted no evidence as to how the required minimum contributions should be calculated. He has submitted neither the amortization periods nor the information necessary to determine the amortization periods that apply to the underfunding of the Morse plans. He has submitted no evidence as to the probable amounts of normal costs over the five year period after the buyout. The Court also lacks evidence (and even allegations) as to the availability or unavailability of the various credits, especially the waived funding deficiency, and as to the effect of discontinuance of manufacturing operations on the minimum funding standard. On this record, the Court cannot quantify, even within wide parameters, the contributions that would be required to satisfy the minimum funding standard.

The Trustee seems to argue that default was inevitable *regardless* of the amounts of the minimum contributions because the Debtor lacked the wherewithal to continue paying its debts, both large and small, as they came due through the five years in question. Therefore, even if the required contributions were minimal, Morse would default on them.

The Court has indeed found that, at the time of the buyout, Morse's capitalization and earning capacity were so deficient that Morse would likely become unable to pay its debts as they came due and have to seek bankruptcy relief or cease operations before the fifth anniversary of the buyout. Despite this finding, however, it is still not

4. The Undertaking required that Morse satisfy the minimum funding standards in effect on August 24, 1984. Therefore, unless otherwise indicated, references and citations to ERISA § 302, as codified at 29 U.S.C. § 1082, refer to those sections as they existed on August 24, 1984.

possible to conclude, without knowing the amounts of the required contributions, that Morse was likely to default on them. The Trustee's argument assumes that Morse would be liable for at least a minimal contribution in each of the five relevant years. But this is not self-evident. For example, it is not at all clear that *any* amounts would be due under ERISA § 302 in years after Morse ceased operations and terminated its plans; nor is it clear that Morse's hardships would not have entitled it to a waived funding deficiency credit.

In view of the complexity of ERISA § 302, the Trustee's omissions—the many unknown variables, the lack of expert testimony, and the complete lack of argument— would render *any* finding as to the amounts of the required contributions almost entirely speculative. And without knowing the amounts of the required contributions, the Court cannot determine the probability of default. Therefore, the Trustee has not borne his burden of proving that default on the pension funding obligations was inevitable or even probable. Accordingly, the Court concludes that the Undertaking obligation should be valued at zero.